**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harvey G. HERBERMAN,
Defendant-Appellant.**

No. 77–5454.

United States Court of Appeals,
Fifth Circuit.

Nov. 6, 1978.

Tex., Stanley Serwatka, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before CLARK, FAY and VANCE, Circuit Judges.

FAY, Circuit Judge:

A grand jury indictment, filed in the United States District Court for the Western District of Texas on March 22, 1977, charged appellant, Dr. Harvey Herberman, with forty counts of making false, fictitious and fraudulent statements regarding material facts in a matter within the jurisdiction of the Department of Health, Education and Welfare (HEW) and the Social Security Administration in violation of 18 U.S.C. § 1001.[1]

Dr. Herberman allegedly submitted false Medicare and Medicaid statements to HEW requesting payment for certain office cystoscopies[2] he allegedly had not performed. The Medicaid counts were subsequently dismissed by the district court as multiplicitous with the Medicare counts and we deal only with the Medicare counts on this appeal.

The jury convicted Dr. Herberman on twenty of the twenty-eight counts ultimately submitted for its determination. The trial judge sentenced him to a total of eight years in prison and assessed fines totalling $50,000. The sentence was as follows: five years imprisonment and a $10,-000 fine on the first count; three years imprisonment and a $10,000 fine on the sixth count; $10,000 each on count 16, count 17 and count 23. The remaining sentences were set to run concurrently with those imposed under either count one or count six.

Raymond C. Caballero, El Paso, Tex., Charles Alan Wright, Austin, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio,

---

1. 18 U.S.C. § 1001 reads as follows:

   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. A cystoscopy is a procedure by which a physician conducts a visual examination of the bladder.

The provisions of 42 U.S.C. §§ 1395–1395gg establish a health insurance program to pay medical and hospital expenses for the aged and disabled. This Medicare program is federally funded and is administered by HEW through the Social Security Administration. In Texas, HEW has a contract with Group Medical and Surgical Services, Inc., a non-profit Texas corporation, to pay claims on Medicare. Group Medical Services is a different corporation than Group Hospital Services but the two services operate together in what is commonly known as Blue Cross and Blue Shield of Texas.

Under the Medicare program claims for reimbursement may be made by either providers or recipients. The provider is the person providing services. The recipient is the patient who receives the services. If the provider chooses to accept assignment and the patient agrees to assign the claim, then payment will be made directly to the provider; if not, payment goes directly to the patient (recipient). According to the testimony of Mr. Phillip Forrest, who testified as representative of Blue Cross and Blue Shield, a Medicare application for payment is divided into two parts: Part A covers hospital services charged by the hospital itself; Part B covers medical services in the office or any other place charged by a physician. Thus, Dr. Herberman, as a provider, would seek reimbursement under Part B and would send the Medicare forms to Dallas, Texas for processing. The method of reimbursement would involve a determination by Medicare of what the cost of a cystoscopy would be and Medicare would then pay 80% of that cost.

In order to show that appellant had submitted false claims to Medicare for cystoscopies he had not performed, the government relied to a large extent on testimony concerning Dr. Herberman's general office procedures. This testimony was not tied directly to any specific count of the indictment.

For instance, some of Dr. Herberman's former employees gave unfavorable testimony about appellant. One former employee, Ms. Deidre White, testified that she knew Dr. Herberman billed for cystoscopies he had not performed because the instruments necessary for the procedure were not always in the office. Ms. White testified that on certain occasions she had seen bills for cystoscopies she felt had not been performed, had then asked the attending nurse if the cystoscopies had been performed, and the nurse had said they had not. Ms. White's testimony did not involve any of the questioned Medicare bills for cystoscopies all of which covered claims filed in 1976, two years after she had left appellant's employment.

Another ex-employee, Ms. Nancy Sanders, testified Dr. Herberman billed for services he had not performed. In one instance, a patient called to complain that the culture and sensitivity tests he was being billed for had not been performed and, according to Ms. Sanders, appellant gave instructions to "make up" a test result and file it in the patient's records. Ms. Sanders testified further that once she asked appellant why some Blue Cross patients were not charged for office visits but were instead charged for dilatations. She said appellant's answer was these patients were too old and too poor to pay for office visits not covered by Blue Cross. Ms. Sanders admitted, however, that she had no way of knowing whether the dilatations were ever performed. In September, 1976, Dr. Herberman fired Ms. Sanders for suspected embezzlement. When asked whether she was given immunity by the prosecution, Ms. Sanders said she had been given immunity. However, the prosecution had denied giving immunity to any of their witnesses.[3]

Another ex-employee, Ms. Frances Yvette Leber, testified she knew appellant filed for cystoscopies he had not performed because these could not be done in the short time patients were in the room with Dr.

---

**3.** In a motion for a new trial, appellant attached the affidavit of Ms. Sanders' attorney stating Ms. Sanders had been given immunity and that the prosecution knew this without question. This motion for a new trial was denied on March 10, 1978.

Herberman. Ms. Leber was fired at the same time as Ms. Sanders for suspected embezzlement. A fourth ex-employee Ms. Deanna Carreon, testified that Ms. White had at one time asked Dr. Herberman for "a piece of the action" telling appellant that he made a great deal of money and should share it. When appellant refused, Ms. Carreon testified that Ms. White vowed "to get even with him."

It was Ms. Sanders and Ms. Leber who originally called Blue Cross to complain about the alleged fraudulent claims. Ms. White, Ms. Sanders and Ms. Leber then met with Mr. James Brown from Blue Cross-Blue Shield before the government began its investigation of appellant.

In addition to the above testimony by Dr. Herberman's ex-employees, the government presented the testimony of each of the patients involved in the particular counts against appellant. Before interviewing the various patients who testified at trial, HEW investigators did not consult Dr. Herberman, another urologist or any other physician. During the interviews, investigators described a cystoscopy based on what the investigators believed it to be. As stated by Mr. George De Luna, an investigator from the Bureau of Health Insurance in charge of investigating Medicare fraud, his knowledge on the procedures necessary for a cystoscopy was acquired by talking to two nurses and by reading some library books and articles. The nurses from whom Mr. De Luna acquired his information worked with him and had never told Mr. De Luna whether they had ever actually seen a cystoscopy. Mr. De Luna obtained statements from 22 of appellant's patients during his interviewing. Ms. Olivia Martinez, a nurse who worked at the Texas Department of Public Welfare, accompanied two investigators, Mr. Jim Busby and Mr. Jim Johnson from the Department of Public Welfare Investigative Division out of Austin, visiting some of the patients. Mrs. Martinez and the two investigators took statements from about ten people. Mrs. Martinez described to the patients what she believed to be the procedure for a cystoscopy.

The record reflects that the procedure described as a cystoscopy to the interviewed patients was as follows: it would last 15-30 minutes; the patient would be prepped and scrubbed; either a saddle block general anesthetic or a local anesthetic would be administered; legs would always be placed in stirrups; clothing would be removed; water would be used; lights would be turned down and the procedure would often be painful. The procedure for an office cystoscopy described by Dr. Herberman differed from the above in almost all respects.

Many of the patients who testified at trial had documented cases of various diseases of the aged which appellant claimed could impair their memories. There was some evidence at trial that many of these patients testified inaccurately regarding the number of times they had been hospitalized in the past.

Dr. Herberman was not allowed to introduce general testimony by experts on the effect diseases of the aged might have had on the memory of older patients suffering from such ailments. There was, however, testimony by various doctors concerning the mental ability of some of the patients called as witnesses. All of these doctors provided some testimony that the particular patient they were speaking about had a type of ailment which could impair memory. A doctor brought in by the government, Dr. Leonard Maldonado, testified that patients with certain diseases common in the aged could forget having undergone a medical procedure such as a cystoscopy.

## I. VENUE

Relying on the United States Supreme Court decision in *Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961) appellant argues venue should have been in the Northern District of Texas, where the various Medicare forms were ultimately filed for payment, rather than in the Western District of Texas where the forms were filled out, executed and mailed.[4]

4. Appellant agrees that if the government had chosen to prosecute under 42 U.S.C.

§ 1395nn(a), venue would have been proper in the Western District since § 1395nn(a) does not

We hold the general venue statute [5] is applicable, and venue was proper in the Western District of Texas.

Dr. Herberman was prosecuted under 18 U.S.C. § 1001 which makes it illegal to knowingly and willfully utter false, fictitious or fraudulent statements in a matter within the jurisdiction of any department or agency of the United States.[6] In order to determine when a matter comes "within the jurisdiction" of an agency or department of the United States it is necessary to examine, in addition to § 1001, the statute governing the particular transaction with a department or agency of the United States. For example, the Supreme Court in *Travis* was faced with the problem of determining when a matter comes within the jurisdiction of an agency or department of the United States for purposes of § 1001. In *Travis*, the agency involved was the National Labor Relations Board (NLRB) and the Supreme Court held that the locus of the offense in that case was in the District of Columbia where the false affidavit was filed and not in Colorado where it was mailed. However, the holding in *Travis* is limited since the applicable statute,[7] Section 9(h) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 146 and further amended by the Act of Oct. 22, 1951, § 1(d), 65 Stat. 601, 602, read in conjunction with § 1001 requires that the NLRB make no investigation nor issue any complaint in the matters described in that statute unless there was on file with the NLRB a non-Communist affidavit. Section 9(h) did not require union officers to file non-Communist affidavits. Instead, the filings were conditions precedent to a union's use of the NLRB's procedures. 364 U.S. at 635, 81 S.Ct. at 358.

speak of a matter "within the jurisdiction" of a department or agency of the federal government but rather makes it criminal to make a false statement at any time. This section reads as follows:

Whoever—

(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under this subchapter,

(2) *at any time* knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to any such benefit or payment,

(3) having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized, or

(4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person,

shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $10,000 or imprisoned for not more than one year, or both. (emphasis added)

**5.** 18 U.S.C. § 3237 reads:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

**6.** See n.1, *supra.*

**7.** Section 9(h) of the NLRA reads in relevant part:

No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, no petition under section 9(e)(1) shall be entertained, and no complaint shall be issued pursuant to a change made by a labor organization under subsection (b) of section 10, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government

## 227

We believe *Travis* merely limits the general venue statute in instances where Congress has particularly limited jurisdiction to the time of filing. The Court in *Travis* stated:

> There would seem to be no offense, unless petitioner completed the filing in the District of Columbia. The statute demanded that the affidavits be on file with the Board before it could extend help to the union; the forms prescribed by the Board required the filing in the District of Columbia; the indictment charged that petitioner filed the affidavits there. The words of the Act—"unless there is on file with the Board"—suggest to us that the filing must be completed before there is a "matter within the jurisdiction" of the Board within the meaning of the false statement statute.

*Id.* at 635–36, 81 S.Ct. at 361.

The relevant statute in this case, to be read in conjunction with § 1001, is 42 U.S.C. § 1395f(a).[8] Appellant contends that the words in § 1395f(a) which say that payment for services may only be made if written request is filed for such payment are comparable to the words in § 9(h) of the NLRB which the Court in *Travis* found required venue to be at the place of filing.

The term "jurisdiction" as used in § 1001 means the power of HEW to administer and enforce the law regarding Medicare. Nothing in § 1395f(a) restricts HEW's power to act until the time of filing.[9] Section 1395f(a) was not intended to limit jurisdiction but merely indicates *when payment can be made* by HEW on Medicare requests. On the other hand, § 9(h) of the NLRA expressly limited the jurisdiction of the NLRB to the time of filing. In cases where Congress has not limited jurisdiction to the time of filing, the general venue statute is applicable. To hold as appellant suggests would be to say that every defendant whose forms are filed in Dallas must defend in Dallas despite the fact that the more convenient and logical forum would be in the district where defendant resides, works, and where his witnesses can be found. Such a result, in the absence of a specific mandate from Congress, would be undesirable.

We follow this Court's holding in *De Rosier v. United States*, 218 F.2d 420 (5th Cir. 1955) and conclude that when the forms containing the alleged false statements were prepared and forwarded to HEW in Dallas, there was set in motion the events which allegedly culminated in the commission of the offenses charged. Therefore, we find the district court was correct in holding venue was proper in the Western District of Texas.

## II. BRADY MATERIAL

The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) held that the Due Process Clause of the Fourteenth Amendment forbids the government, in a criminal case, from suppressing evidence favorable to an accused, where such evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the

---

8. 42 U.S.C. § 1395f(a) reads in relevant part:

    (a) Except as provided in subsections (d) and (g) of this section and in section 1395mm of this title, payment for services may be made only to providers of services which are eligible thereof under section 1395cc of this title and only if—(1) written request, signed by such individual, except in cases in which the Secretary finds it impracticable for the individual to do so, is filed for such payment in such form, in such manner, and by such person or persons as the Secretary may by regulation prescribe, no later than the close of the period of 3 calendar years following the year in which such services are furnished (deeming any services furnished in the last 3 calendar months of any calendar year to have been furnished in the succeeding calendar year) except that where the Secretary deems that efficient administration so requires, such period may be reduced to not less than 1 calendar year.

9. We find no merit in appellant's argument that no jurisdiction exists because Blue Cross and Blue Shield are not "departments or agencies" of the government for purposes of § 1001. The relationship of Blue Cross and Blue Shield to HEW, that is a contract relationship whereby these non-profit corporations pay Medicare claims, will not prevent prosecution under § 1001.

prosecution. *Id.* at 87, 83 S.Ct. 1194. In *Brady*, the Supreme Court stated:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecution in the role of an architect of a proceeding that does not comport with standards of justice . . .

373 U.S. at 87–88, 83 S.Ct. at 1197. (footnote omitted)

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court addressed the issue of a defendant's right to a fair trial mandated by the Due Process Clause of the Fifth Amendment.[10] The Supreme Court recognized that a prosecutor is not under a duty to disclose all his files to the defense, but nevertheless concluded that if the prosecutor has something in his files which is highly probative of innocence, he should be presumed to recognize its significance even if he has actually overlooked it. *Id.* at 110, 96 S.Ct. 2392. On the issue of whether the request for *Brady* material must be specific the Court said:

As the District Court recognized in this case, there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that "justice shall be done." He is the "servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." . . . This description of the prosecutor's duty illuminates the standard of materiality that governs his obligation to disclose exculpatory evidence. 427 U.S. at 110–11, 96 S.Ct. at 2401. (footnote omitted)

In *Agurs* the Supreme Court set the standard for materiality stating that if the omitted evidence creates a reasonable doubt which would not otherwise exist, constitutional error has been committed.[11] The Supreme Court recognized that the omitted evidence must be evaluated in the context of the entire record; if there is no reasonable doubt about guilt despite the additional evidence, there is no reason for a new trial. "On the other hand," the Supreme Court declared, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113, 96 S.Ct. at 2402.

The district judge reviewed the grand jury testimony and found that it did not contain *Brady* material. However, his review did not take place until after the trial

---

**10.** The Supreme Court in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) said its construction of the Due Process Clause of the Fifth Amendment would apply equally to the comparable clause in the Fourteenth Amendment relating to trials in state courts.

**11.** In *United States v. Brown;* 574 F.2d 1274 (5th Cir. 1978) this Court remanded the case to the trial court to determine by an "in camera" inspection whether the I.R.S. audit of Brown's tax records for 1974 and 1975 contained exculpatory evidence material to the guilt or to the punishment of appellant, and which may have affected the outcome of the trial. This Court directed the trial judge that if he found the audit did not contain exculpatory evidence, he was authorized to enter an order affirming the judgment of conviction and sentence. *Id.* at 1279.

In *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978), this Court stated that a retrial under *Brady* is required only if, after conviction of a defendant, it is learned that the evidence requested and not produced creates a reasonable doubt that did not otherwise exist as to the guilt of the accused.

had been completed and the sentence had been imposed. We can well understand the trial judge's reluctance to grant a new trial at this stage. At the end of a long and complicated trial, the motion was made for a new trial based on information, belatedly given by a grand juror to Dr. Herberman, that the government had withheld possible *Brady* material. In the face of repeated questioning by the trial judge, the prosecutor had maintained throughout the trial that the grand jury testimony did not contain any *Brady* material. We believe it is the prosecutor's duty to request that a court review material which could conceivably be labeled *Brady* material before the trial is finished. The prosecutor in this case refused to do so.

We have carefully examined the grand jury testimony that appellant alleges might contain *Brady* material and we have also examined the complete record on appeal. There was testimony presented to the grand jury by three of appellant's former employees stating that Dr. Herberman did not bill for cystoscopies he had not performed.[12] The grand jury testimony of these witnesses was not given to appellant although he requested it. The grand jury testimony withheld from appellant was of such character that it certainly could have cast a reasonable doubt on the truth and accuracy of the testimony of the older patients. Furthermore, this undisclosed testimony directly contradicted the testimony of appellant's former employees who testified that Dr. Herberman billed for cystoscopies he did not perform. There was also grand jury testimony contradicting allegations that Dr. Herberman's nurses made the hospital rounds and appellant charged for these visits as if he had made them. There

was testimony that instruments necessary for a cystoscopy were prepared daily, contradicting allegations by Ms. White that she knew cystoscopies were often not performed, although billed for, because there were days when the instruments were not in the office. Finally, there was grand jury testimony that when Dr. Herberman billed for a urinalysis, it was always performed, negating allegations to the contrary.

██ It is difficult to understand how the prosecution could have concluded that the grand jury testimony contained no material which could have cast a reasonable doubt in the minds of the jurors as to appellant's guilt. This is especially true as the case against Dr. Herberman was weak, relying upon the general testimony of former employees and the specific testimony of older patients many of whom had documented cases of diseases which could impair memory.[13]

### III. OTHER MISCONDUCT

In *United States v. Morris*, 568 F.2d 396 (5th Cir. 1978), this Court stated that the sole purpose of closing arguments is to assist the jury in analyzing, evaluating and applying the evidence.

This Court has repeatedly held, however, that an attorney may not say anything to the jury implying that evidence supporting the attorney's position exists but has not been introduced in the trial. It follows that an attorney may not express his personal opinion concerning the merits of the case. He may, as stated, urge a conclusion based on the evidence . . . He may not state that he could have called additional witnesses whose testimony would have supported his version of

---

12. This testimony is set out in Appendix A, *infra*.

13. One former employee, Ms. Irma Sanchez, did testify at trial that she had not seen anything unusual about appellant's billing procedure and that she was not aware of cystoscopies billed for that were not performed. Ms. Sanchez's testimony was not as strongly in favor of appellant as that of the other witness-

es whose testimony was not provided to appellant. Even if Ms. Sanchez's testimony at trial had been as strong as that of the other witnesses whose grand jury testimony was not produced, the weakness of the government's case made it essential that the grand jury testimony be provided to appellant since this grand jury testimony could have tilted the scales toward innocence.

the case . . . In general, an attorney may not inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence.

568 F.2d at 401.

■ The primary reason for restraining a prosecutor and demanding a high standard of care is that, due to his position as a public official, his allusion to extrinsic evidence and interjection of his own opinion may be given undue weight by the jurors.

■ In the case before us, the prosecution during summation argued that there were perhaps certain witnesses who had been subpoenaed but did not testify because they may have "mysteriously disappeared." [14] There was nothing in the evidence which indicated there were any witnesses who had been subpoenaed and who had disappeared. In fact, the government admitted during oral argument before this Court that the subpoenas referred to were not issued. Statements of this kind will not be tolerated by this Court.

There were other instances of improper conduct on the part of the prosecutor in this case. During trial the prosecution's witness, Mr. James Brown from Blue Cross, testified concerning his conversations with three of Dr. Herberman's former employees. When asked if these conversations were recorded by tape, Mr. Brown stated that he believed the tapes had been destroyed. The prosecution subsequently admitted that it knew these tapes had not been destroyed on May 12, the day after the government's witness had stated his belief to the contrary. Yet, it was not until May 16, when the defense again formally asked for these tapes, that the prosecution admitted having them.[15]

During the course of the trial, and particularly during rebuttal, the government made repeated references to the submission by appellant of allegedly false claims to Blue Cross-Blue Shield in non-Medicare matters. None of these claims, or supporting documents, were provided to appellant. At the outset of the trial, the district court had granted a motion in limine eliminating such alleged claims. The prosecution ignored this ruling by continuing along these lines with the testimony of rebuttal witnesses. At one point, the district court prevented the government from presenting the testimony of a witness as to these non-Medicare claims. Subsequently, the court allowed another witness to touch upon these claims but ultimately stopped the testimony when he realized the subject matter.

Also, during examination of Ms. Sanders, the defense asked if she had been given informal immunity by the government before testifying and she answered that she believed she had been given immunity. The prosecution denied having given her informal immunity. In a motion for a new trial, appellant attached an affidavit from Ms. Sanders' attorney in which he stated that his conversation with the prosecutor was clear and that his client had been given informal immunity by the government.[16]

We wish to emphasize that the district judge consistently attempted both to prevent and to cure such prosecutorial misconduct. For instance, Judge Wood sustained the objection made during the prosecution's summation regarding the alleged disappearance of witnesses. He also demanded in no uncertain terms, once it was revealed that the government had them, that the tapes

---

14. As part of his summation the prosecutor stated as follows:

Now, Mr. Caballero indicated in his opening statement, he said he was going to bring two of the patients. Did he? I wonder why he didn't. Now, he said I should have brought the nurses, that there were people that testified in front of the grand jury or whatever. Do you know whether they were in town to be served with a subpoena? You don't know that, do you? You don't know whether any effort was made to serve them with a subpoena and mysteriously the people weren't around, couldn't be found.

Mr. Caballero: Your Honor, there is no evidence of that.

The Court: I'll sustain that objection. I'll ask you to disregard the last statement.

15. This testimony is set out in Appendix B, *infra*.

16. However, in March, 1978, this motion was denied by Judge Wood.

which the government had asserted were missing be handed over to appellant immediately. The district judge stopped the testimony of the second rebuttal witness on the non-Medicare claims. Nothing could have been done by the trial judge during the trial on the alleged false statement by the prosecution regarding immunity of the government witness since her attorney's affidavit was not procured until after the trial. The witness did state in court, contrary to the prosecution's position, that she believed she had been given immunity.

■ The prosecutor acted improperly in many instances, and some examples are enumerated above. Even though any single instance might not have resulted in a reversal, we are convinced that the sum of all these errors prevented appellant from obtaining a fair and impartial trial. The prosecution made too many improper suggestions, introduced too much improper evidence and denied the existence of evidence on too many occasions. What inferences were planted in the minds of the jurors we cannot determine. We hold, however, that their verdict could not have been based solely upon proper consideration of relevant and admissible evidence.

## IV. SUFFICIENCY OF EVIDENCE

■ We are aware that in evaluating the sufficiency of the evidence the reviewing court must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Lonsdale,* 577 F.2d 923 (5th Cir. 1978). This Court in *Lonsdale* further stated that the test of the sufficiency of proof on a motion for judgment of acquittal, and on review of the denial of such a motion, is whether the jury might reasonably conclude that the evidence is inconsistent with the hypothesis of defendant's innocence. 577 F.2d at 925.

■ Nonetheless, a trial judge has the duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government,

is so scant that the jury could only speculate as to defendant's guilt. The test is whether a reasonably minded jury must have had a reasonable doubt as to the existence of any of the essential elements of the crime. *Id.*

■ After a thorough review of this lengthy record we find appellant's conviction must be reversed on Count 9, Count 10, Count 12 and Count 19. The government's proof depended primarily on the testimony of the patients of Dr. Herberman and the testimony of the patients on these four counts was clearly insufficient. The general testimony of the investigators, the people from HEW and the ex-employees was not tied to any particular count. Without the patients' testimony, there was no case.

On Count 9 of the indictment there is a record of one instrumentation of the patient, Mr. Gregorio Mora. When Mr. Mora was interviewed by the government investigators, he stated that he did not recall having been instrumented for a cystoscopy. However, at trial he testified that upon further reflection after the investigators left his home, he realized that in fact he had been instrumented and accordingly advised the government. The prosecution did not advise the defense of this conversation with Mr. Mora and did not produce the notes taken during the conversation until cross-examination of Mr. Mora when the trial judge examined the notes and handed them to appellant's counsel. Clearly, in the case of Mr. Mora, a reasonably minded jury must have had a reasonable doubt as to an essential element of the crime charged.

On Count 10, the patient, Mr. Christino Melendes remembered one cystoscopy but admitted on cross-examination that he really did not know when in the year 1976 this cystoscopy took place. The government's exhibits showed only one cystoscopy billed during 1976. We feel that on this Count also the jury could not reasonably conclude that the evidence was inconsistent with the hypothesis of the defendant's innocence and accordingly must have entertained a rea-

sonable doubt as to an essential element of the crime charged.

On Count 12, Mr. Manuel Ortiz testified that he did not know what Dr. Herberman did on the date of the questioned cystoscopy, January 30, 1976. The testimony during cross-examination in relevant part, was as follows:

Q. January 30, 1976. Do you know what Dr. Herberman did or did not do to you?

A. I don't know whether it was January 30, 1976, when he operated on me.

Q. Do you know what Dr. Herberman did or did not do to you on January 30, 1976?

A. I sure don't if that was the date.

Q. Thank you, Mr. Ortiz.

Mr. Caballero: I have no further questions.

We believe the jury must have had a reasonable doubt as to the allegations in this Count. Mr. Ortiz did not know whether the cystoscopy had or had not taken place on January 30, 1976, the date the government alleges no cystoscopy took place.

On Count 19, Mr. Agustin Madrigal had first told investigators that Dr. Herberman had not placed an instrument into his penis. At trial he testified that the doctor had instrumented him. Again, we feel the evidence on this Count was insufficient for a finding of guilt.

## V. CONCLUSION

The trial judge's determination that venue was proper in the Western District of Texas was correct and we affirm that portion of the district court's ruling.

We reverse the jury's verdict on Count 9, Count 10, Count 12 and Count 19 of the indictment since we believe the evidence was wholly insufficient on those four counts. We express no opinion as to the remaining counts, for the test is not whether we would have found as the jury did, but whether the jury could have found as it did looking at the evidence in the light most favorable to the government.

We remand the remaining counts for a new trial because of the abundance of errors. In combination they certainly could have provided the impetus which swung the scales toward guilt. We caution the prosecution to make sure that in its zeal to convict, it does not deprive a defendant of his or her right to a fair trial. The interests of the people of the United States, whom the prosecutor represents, are not served by depriving a defendant of the rights guaranteed by the Constitution of the United States.

■ Dr. Herberman was sentenced to eight years in prison and a fine of $50,000. Although we do not take exception to the sentence, as it is within the statutory limits, we cannot help but express disapproval of the conduct of the prosecution throughout this trial. As Judge Wood once admonished the prosecutor, "trial by ambush" is not the name of the game.[17]

Affirmed in part, reversed in part and remanded for a new trial.

## APPENDIX A

PARTIAL TESTIMONY OF TERESA MENDEZ:

Q. How long would it take to perform a cystoscopy?

A. About ten minutes, maybe.

Q. About ten minutes.

A. Yes.

Ms. Lege: Would he get a written consent to do this?

A. Not in the office.

Q. Did you ever make hospital visits for the doctor?

A. No, sir.

Q. Strictly at the office?

A. Strictly at the office.

Q. Were you ever aware of any medical procedures that were billed for, but were not performed?

---

17. See Record at 2109.

APPENDIX A—Continued

A. I never had anything to do with the billing or anything like that.

Q. You would not know if a cystoscopy was billed for and not performed because you would not know it was billed for?

A. Many times I entered in the chart myself that it was done. Whether it was billed or not, I have no way of knowing.

Q. Would you actually enter it on the chart?

A. Yes, and the doctor would fill in what the findings were.

Q. As to what the cystoscopy showed?

A. Yes.

Q. Did you ever fill in when a dilatation was performed?

A. No, he usually did that.

Q. You have no familiarity with the billing system?

A. No, sir.

Mr. Serwatka: I don't believe I have any further questions.

Juror: To your knowledge, were there ever any urine specimens taken that were not analyzed?

A. Not while I was there.

Juror: Is it possible that some could have been mixed up with the names?

A. No, sir. They were done immediately. There was no way to do that.

\* \* \* \* \* \*

PARTIAL TESTIMONY OF BERTHA MELENDEZ:

Q. Are those inserted into the penis also?

A. Yes. Not all of it is inserted. They have a little curved tip and on a male patient, they have what they call fila-forms that would attach to the sound. It is a very very small plastic—maybe the size of a straw on a broom. That would go into the urethra, not the sound. The sound is used on females because we have a shorter urethra and it curves in.

Q. How many dilatations were performed?

A. We had quite a few done a day, maybe three or four a day.

Q. Did you also set up these instruments?

A. Yes.

Q. Okay. Were you familiar with the doctor's billing procedures?

A. No.

Q. Who was working in the office at the time you were working?

A. Let's see—Diana Carreon and Dee White.

Q. Those were the two other employees?

A. When I was working there, one was the bookkeeper and one was the insurance clerk.

Q. Was there also a receptionist?

A. Yes.

Q. Who was that?

A. There were two while I was there, Ernie Holden and Yvette. I can't remember her last name.

Q. Was that Leber?

A. She had just recently married when I was getting ready to quit.

Q. Did you ever again visit any patients in the hospital?

A. No.

Q. Were you ever aware of any medical procedures that were billed for, but not performed by the doctor?

A. No.

Q. You were never aware of that?

A. No, I was not.

Q. Were you ever aware that the doctor billed for an office visit—you stated you didn't visit any patients in the hospital?

A. No.

Q. Do you know of any reason why Dee White or Ms. Carreon or any other person would say you made hospital visits for the doctor to the patients?

A. It was in the process of—there were two of us at the time before I came, that one of us would go to the hospital, but before I quit it was never settled.

APPENDIX A—Continued

Q. Which would go to the hospital?

A. Which would go or that they were going to get with the program.

Q. To your knowledge, you were never aware of any cystoscopies or dilatations or cultures or urine analyses that was ever billed for that was never performed?

A. No.

Q. To your knowledge, everything billed for was in fact done.

A. Right.

Q. Have you been contacted by the doctor recently?

A. No, I have not.

Q. Do you know why anyone would say you were?

A. No.

Mr. Serwatka: Any questions from members of the Grand Jury? Thank you.

\* \* \* \* \* \*

PARTIAL TESTIMONY OF ANTONIA VILLALOBOS:

Q. And you have made hospital rounds by yourself?

A. Yes.

Q. And would you report to anybody the visits that you made?

A. Every day to the doctor after office hours.

Q. At the office itself?

A. At the office, yes.

Q. Were you ever aware of any procedures, either the cystoscopy or the dilatation or anything of this nature that was billed for and never performed?

A. In one case, yes, sir.

Q. What was that case?

A. I don't really remember the name of the patient or anything, but I remember a call was made to the office and I heard from the girl who answered the phone that it was a patient wanting to know about this dilatation that was written in his bill. I believe the mana-ger took care of the call. She talked to the patient. I don't know exactly what she said.

Q. Who was the manager then?

A. Nancy Sanders. She talked to the patient and I guess she straightened it out.

Q. Have you discussed within the last couple of months with anybody Dr. Herberman and his practice and perhaps what we have questioned you on today?

A. I did talk to Nancy Sanders on the phone.

Q. When was this?

A. This was a long time ago. I don't even think it was two months ago. I think it was longer.

Q. Six months?

A. No, about three months. Before the holidays.

Ms. Lege: About what?

A. She called me up and she was telling me that Dr. Herberman had some trouble. Apparently some patient was being charged for services that were not rendered, according to Nancy. She called me up to say "Maybe you will get called upon."

Ms. Lege: She is the one that fired you, right?

A. Yes.

Ms. Lege: Doesn't it seem strange that she would call you?

A. Very, very. She has called me two or three times.

Juror: After she fired you, you didn't talk to the doctor to see if you could get your job back?

A. No, I did not.

Mr. Cain: You said you hurried back to the doctor's office about 1:00 o'clock and got the charts out for the patients the doctor would see. Then after the doctor had made his procedure, did you check that chart for prognosis before the chart was returned to the secretary?

APPENDIX A—Continued

A. No, when I saw the chart, I wrote the outcome of the urinalysis and after that, if the patient would come in, I would go ahead and put it on the door, according to where the patient was. After the doctor saw it, it went directly to the office where he laid down the charts of the patient he had already seen. When I would see the chart again, or to see how the patient was doing, is on his next visit. On the last visit before, I would note "Very good," or "Doing better," you know, what he had done to the patient. That same day, no.

Juror: Did it ever occur to you that maybe some services were being charged for that were not performed?

A. No, not really. I did not think Dr. Herberman was capable.

Q. You didn't think he was capable of doing that?

A. No. To me he is a fantastic doctor.

Q. Was there any indication in your personal impression of the doctor, which may have indicated this was happening?

A. I don't understand.

Q. You said the basis on why you state that is because of your feelings or impressions of the doctor. Was anything other than your feelings or impressions of the doctor ever come to your attention where that might have happened?

A. You mean why I formed my opinion?

Q. Right, other than the one call.

A. Why did I form the opinion that he was a good doctor?

Q. No, other than that, did anything ever come to your attention, as his nurse for a year, that perhaps some procedures were billed for that were never performed?

A. No, not that I can remember.

Ms. Lege: You said after office hours you told him what happened with the patients. Did he in turn go make rounds?

A. Yes. I was not there when he left the office. I left early—not early, just as compared to the time that he left. I left early. I would notice that when I would make rounds the next day, I would say—sometimes they would have questions to the doctor. They would say "What time will he come in?" I would say "If he finishes surgery, maybe he will be in before he come to the office. If not, he might be in late at night. They would tell me "Well, he came in real late last night and woke me up." This is why I knew he was sometimes coming in real late.

Q. Did he write progress notes on a daily basis?

A. Yes.

Ms. Lege: And that way, you knew he was making rounds.

A. Exactly.

\* \* \* \* \* \*

Juror: Did you visit all the patients or were there some he said "No, don't bother with them. I will get to them later."

A. No, I visited all the patients.

Juror: In his office in a cystoscopy, did he turn the lights off with a female patient?

A. As he put in the instrument, to see with the scope, I would turn off the lights so that he could see better without having any other light.

Ms. Lege: Did you wound check, dressing changes, things like that?

A. On the patients in the hospital. I would check out their vital signs, their dressings, progress notes, just their general appearance to see how they were doing. I would look to see if they were running a temp. Then of course, I would ask the nurse about giving me information on the night before or any special requests.

Ms. Lege: Did you leave a note on the chart for him, anything special, or did you just leave it until you saw him?

APPENDIX A—Continued

A. If there was anything special that needed his urgency, I would go ahead and see if I could get hold of him, but it never came to that.

Juror: Were there ever times you would ask a patient "Well, has the doctor seen you since I saw you yesterday?" Were there ever any times when the patient said "No, the doctor has not come by?"

A. Maybe one or two occasions. Maybe he had late surgery. I don't remember that many times. Maybe one or two times the whole time I was there, that he definitely did not get to see them. Of course, I would give him a report at night. He usually went to see all of them.

## APPENDIX B

Mr. Serwatka: And my daily transcript indicates on May 11, 1977, Mr. Brown was called as a second witness, from pages 614 to 741.

The Court: Perhaps you are right.

Mr. Serwatka: Then, on Thursday evening someone contacted, one of our agents contacted Mr. Brown and asked him, based upon our information that he had found the tapes and had another transcript made and to be available to bring that out to the Court.

The Court: Let me find out when Mr. Brown did testify, Mr. Serwatka. Mrs. Sampsell tell me when did Mr. Brown testify.

The Clerk: I have he testified on 5–11–77.

The Court: All right. 5–11–77, the second witness on Wednesday morning, is that right?

The Clerk: Yes, sir.

The Court: Very well. Let the record so reflect.

Mr. Serwatka: Now, we told Mr. Brown to be available to bring this to El Paso. Okay. In the conversation that myself or the agents had, I don't recollect having another conversation with Mr. Brown until he appeared yesterday about 10:00, pursuant to the Court's order.

Now, Mr. Brown indicated that substantially what is in the transcript is exactly what is on the belt. When the Court hears what is in the transcript, as to the State's statements given, they are essentially the same. Now, I have—I was ready and able and had indicated that he would come out here to present the dicta-belts and the transcript. I indicated that he should be available. When it became aware that we were, perhaps, going to have other people from Blue Cross and Blue Shield, there was a question made that they bring this, the transcript and the tapes for the Court's hearing and for the Court's use.

Now, the Defense got into their case on Friday. Okay, I was not able to bring or call any more witnesses while the Defense was presenting their case.

The Court: Is that the reason you didn't let me know about the tapes?

Mr. Serwatka: Yes, Your Honor.

The Court: Why couldn't you approach the bench, you had no trouble approaching the bench and telling me you had the tapes.

Mr. Serwatka: Pardon me.

The Court: Was there any reason you couldn't say that may I make an announcement to the Court, last Thursday, I have the tapes.

Mr. Serwatka: Perhaps I—

The Court: On Friday, or Saturday or Monday? Late Monday Mr. Caballero made the request for them, four days later, and you finally tell me that you do have them.

Mr. Serwatka: Perhaps not. The reason—

The Court: I thought you told me yesterday you didn't have them, but you were going to get them?

Mr. Serwatka: There were on the plane. I couldn't say that they were here. They were on the plane. As a matter of fact, when the Court was telling me and ordering me they were already in El Paso. My intentions, perhaps I should have mentioned to the Court before and, but

APPENDIX B—Continued

my intentions on rebuttal was put this witness on first and present the tapes. Mr. Caballero and Mr. Hardy were going to get a transcript prior—

The Court: Well, my question is simply, if you knew about the tapes last Thursday why didn't you tell me Thursday, Friday, Saturday until noon, or sometime yesterday, or shown counsel the common courtesy of letting them know that those tapes were available and that Mr. Brown had not told the truth, that his testimony was untrue. I am not saying that it was not an innocent mistake on his part, I'm saying that it was just not true. He said that he didn't—his testimony is totally incorrect. It is in error. He testified that he made a recorded transcript, that the belt was erased, reprocessed, but only after he had totally and completely transcribed every word on the tape and, then, after that it had been edited and placed in a revised statement that the transcript was destroyed.

Now, that testimony is now, obviously, no matter how vigerously (sic) try to defend Mr. Brown, that testimony is not true, is it?

Mr. Serwatka: Yes, Your Honor, it is not true. The Court itself is well aware—

The Court: You gave no indication, even though you knew it was not true, Thursday, Friday, Saturday and Monday until Mr. Caballero got on his heels and demanded, again the same thing that he had been demanding throughout this whole trial, that you admitted to him that you knew that testimony was not true and that there were other tapes?

Mr. Serwatka: But, Your Honor, as the Court well knows, the Court itself just said momentarily ago, that for innocent reasons, apparently, Mr. Brown testified as he did. I don't think—

The Court: Why is there anything wrong in letting me know that there was an innocent mistake made and the tapes were coming?

Mr. Serwatka: It was my intention to make this known and put it on as my first rebuttal witness. Perhaps as far as

judgment is concerned I should have went up to the Court and—I didn't know on Thursday, Your Honor, I don't believe, until the Court adjourned.

The Court: In other words, you made me wait five days, Thursday through Monday, of the Court sessions, and forced counsel to again say that there is something more to this case than I have been led to believe. They have not played fair with me, they actually are—they are attacking me from ambush, they are playing their cards, in effect, on the table, they have got tapes and I am demanding them. I said that Mr. Serwatka, we have been over this before, do you have any tapes. You said that yes, we do. Then, you finally admitted that you knew since last Thursday.

Now, I'll tell you, Gentlemen, as far as I am concerned the hearing is at an end except I would like to hear from Mr. Caballero. You may take your seat.

Mr. Caballero: Your Honor, just one note of explanation. Of course, all we want are the Jenks (sic) Act statements that we are entitled to. It was my clear understanding, Judge, when I went and talked to Mr. Brown in Dallas that he had a three or four hour conversation with these girls and he recorded all of them. I may have been incorrect, but that was my understanding then and it is my understanding when I just heard the Court read the transcript and some of the questions that you propounded to Mr. Brown that he recorded the whole thing and then made a statement. While I was questioning Mr. Brown, the Judge knows the difference, as I do, and any lawyer does, that a transcript and a statement is—one is a question and answer type thing and the other one is a narrative of sort. I knew at that point that I didn't have a transcript. That is all I want to say about that. All I want is a transcript.