**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

No. 95-10212

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

BERNARD SCHUCHMANN,

Defendant-Appellee.

Appeal from the United States District Court
For the Northern District of Texas
May 24, 1996

Before POLITZ, Chief Judge, and GOODWIN[1] and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

The government appeals the district court's judgment of acquittal. Because the government did not prove the knowledge element of the alleged crimes beyond a reasonable doubt, we affirm.

BACKGROUND

In early 1985, Bernard Schuchmann purchased Taos Savings & Loan and renamed it First American Savings Bank ("FASB"). In February 1985, Schuchmann obtained approval to charter a new institution, American Federal Savings Bank, which was later renamed Americity Federal Savings Bank ("Americity"). Under the banking regulations, Schuchmann had twelve months to capitalize this new

_____

[1] Circuit Judge, of the Ninth Circuit, sitting by designation.

institution.

Schuchmann solicited several business colleagues to invest in Americity. Among these investors was Steve Sloan, a businessman who had a prior business relationship with Schuchmann and FASB. Sloan agreed to purchase $645,000 worth of the newly issued stock. Although other investors obtained loans from FASB to invest in Americity, Sloan was unable to do so because he previously borrowed a substantial sum of money from FASB and FASB's loans-to-one-borrower limit precluded an additional loan.

As a result of this limitation, Sloan asked his administrative assistant, Laura Bentley, to request a loan from FASB for $210,000. Bentley completed a loan application and signed a promissory noted, both provided to her by Sloan. On the application she listed $21,000 as her monthly salary, $48,000 as her savings, and $9,600 in director's fees, dividends, interest, and bonuses. Sloan then signed a promissory note in Bentley's favor and gave her a letter, made out "to whom it may concern," describing his own responsibility for repaying the money.

Bentley had no contact with anyone at FASB about her loan before it was approved. Schuchmann personally granted the loan and $210,000 was wired into Bentley's personal account. Bentley then wrote Sloan a check for $210,000, and Sloan thereafter provided her with the funds to make the loan payments. Bentley paid the loan off with interest.

The jury found Schuchmann guilty as charged. After the jury returned its verdicts, the district court granted a judgment of

acquittal pursuant to Federal Rule of Criminal Procedure 29 and conditionally granted a new trial.

## DISCUSSION

Under Rule 29, a trial judge "has the duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to defendant's guilt."    United States v. Herberman, 583 F.2d 222, 231 (5th Cir. 1978).   In reviewing a judgment of acquittal, we view the evidence in the light most favorable to the jury verdict and will affirm "if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt." United States v. Castro, 15 F.3d 417, 419 (5th Cir.), cert. denied, 115 S. Ct. 127 (1994).   If, on the other hand, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." United States v. Pennington, 20 F.3d 593, 597 (5th Cir. 1994).

The jury found Schuchmann guilty of conspiracy to defraud the United States and Federal Home Loan Bank Board and to violate 18 U.S.C. §§ 1006, 657 in violation of 18 U.S.C. § 371 (count one)[2]; making false entries in bank records in violation of 18 U.S.C. §

---

[2]   To establish a violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: (1) an agreement between two or more persons; (2) to commit a crime against the United States; and (3) an overt act committed by one of the conspirators in furtherance of the agreement. United States v. Mackay, 33 F.3d 489 (5th Cir. 1994).

1006 (counts two through four)[3]; and willful misapplication of funds in violation of 18 U.S.C. § 657 (count five)[4]. The defendant's knowledge is an essential element of all five counts of conviction. Thus, the government must prove beyond a reasonable doubt that Schuchmann knew in October 1985, when he made the Bentley loan, that the loan was made for Sloan's benefit.

Our task, therefore, is to review the evidence bearing on Schuchmann's mens rea and determine whether a jury could reasonably infer from this evidence that he made the loan to Bentley knowing it was really for Sloan. After a careful review of the record, we hold that the district court properly granted the judgment of acquittal. Although jury verdicts should be overturned with great hesitancy, the evidence viewed as a whole does not meet the constitutionally high standard of proof beyond a reasonable doubt.

There were only two witnesses at the trial who testified

---

[3]  To establish a violation of 18 U.S.C. § 1006, the government must show: (1) that the institution is a lending institution authorized and acting under the laws of the United States; (2) the defendant was an officer, agent, or employee of the institution; (3) the defendant knowingly and willfully made, or caused to be made, a false entry concerning a material fact in a book, report, or statement of the institution; and (4) the defendant acted with the intent to injure or defraud the institution or any of its officers, auditors, examiners, or agents. United States v. Parks, 68 F.3d 860, 865 (5th Cir. 1995), cert. denied, 116 S. Ct. 825 (1996).

[4]  A conviction for misapplication of funds in violation of 18 U.S.C. § 657 requires that the government prove beyond a reasonable doubt: (1) that the savings and loan institution was authorized under the laws of the United States; (2) that the accused was an officer, director, agent or employee of the institution; (3) that the accused knowingly and willfully misapplied the monies or funds of the institution; and (4) that the accused acted with intent to injure or defraud the institution. Id. at 863.

regarding Schuchmann's knowledge of the Bentley loan, Don Faraone and Laura Bentley. Steve Sloan, as an indicted co-defendant, did not testify. Laura Bentley, the straw borrower, testified that she did not know whether Schuchmann knew that Sloan would receive the loan proceeds:

> THE COURT: So I'm understanding this, you don't know of your own personal knowledge whether Mr. Schuchmann knew about the real deal on the two hundred ten thousand dollar loan, that Sloan was really getting the money. Is that what you are telling us?
> BENTLEY: I have no personal knowledge. (R.9, p.50)

When Bentley characterized her activities with Sloan as "deceptive," the court again asked for clarification:

> THE COURT: Ma'am, I'm not clear about something. When did you come to the conclusion that it was deceptive? Are you saying you didn't think it was back then?
> BENTLEY: Again, that wasn't my focus. I know the fact that it was very private and not to be talked about other than between Steve and myself. (R. 10, p. 107)

Although Bentley had no personal knowledge of Schuchmann's involvement, the government argues that there was insufficient information about Bentley's creditworthiness on her loan application to justify the loan, and therefore, Schuchmann must have known that Bentley was a nominee for Sloan. On the loan application, Bentley listed $21,000 as her monthly salary, $48,000 as her savings, and $9,600 additional income from director's fees, dividends, interest, bonuses, and commissions. Bentley testified that the income she had mistakenly listed as monthly was really her yearly income. Because Schuchmann knew about Bentley's employment as Sloan's administrative assistant, the government contends that Schuchmann would have recognized this error and concluded that

5

Bentley was not qualified for the loan.

Even if Schuchmann knew Bentley's income information was incorrect, however, the evidence shows that Bentley's family wealth provided Schuchmann a legitimate reason for approving the loan. Bentley admitted that it was likely that Schuchmann knew about her family wealth at the time her loan was approved. She testified that the director's fees listed on her loan application were from her service on the Board of Directors of the Trident Corporation, a large and successful corporation owned by her father. Eric Stattin, the only expert witness with underwriting experience, testified that a banker would consider the wealth of the borrower's family in deciding whether to approve a loan:

> Question: Would it be reasonable, in your professional opinion, for the banker, in determining whether or not to make a loan, to take into consideration the wealth of the borrower's family?
> Stattin: Yes. (R. 20, p. 74)

Moreover, the government's witness William Gilligan testified to this reality:

> Question: And a lender might take into consideration things that are not shown in the loan application or anything else that he sees in paper?
> Gilligan: That's right, sure.
> Question: I mean, there are things like the wealth of the borrower's family. Those are things that any lender would consider, is it not?
> Gilligan: I would, yes. I think most would.
> (R. 15, p. 208)

This testimony demonstrates that Schuchmann may have believed that Bentley was qualified for the loan and thus permits the inference that Schuchmann was acting with lawful intent.

The first, perhaps only, conversation that Bentley had with

Schuchmann concerning the loan further connects Bentley's credit standing to her family wealth. Bentley was uncertain of when the conversation took place, her best estimate putting it in August of 1986. Schuchmann told Bentley that the bank examiners had flagged her loan and some others and were questioning them. Schuchmann then told Bentley:

> [H]e had taken care of it. He had spoken to the examiners himself and he was taking care of the questions that they had raised. And that he had mentioned to them about the wealth of my father, and that he was going to personally vouch for my good credit standing. And that if anybody approached me, questioning me about this loan, any examiner, then I was to not respond, but to tell Bernie about it and he would handle it. (R. 10, p. 148-49)

The government argues that this conversation proves that Schuchmann knew about the nominee nature of the loan and wished to deceive the FHLBB about it. We disagree. This testimony provides equal circumstantial support to a theory of innocence, indicating that Schuchmann believed Bentley's family wealth played a role in assessing her creditworthiness. Sloan's involvement in the loan was not acknowledged during this conversation, and the government failed to prove the impropriety of Schuchmann's request that Bentley refer questions about her loan to him.

Bentley's understanding of her arrangement with Sloan further supports the defense's position that Schuchmann expected Bentley to bear the burden of repaying her loan. Bentley testified that she believed she was personally liable to the bank for her loan and that the bank expected her (and not Sloan) to repay the loan. Thus, to assuage her fears about repayment, Sloan agreed to

7

indemnify Bentley for the loan, but the letter of indemnification was never provided to Schuchmann, perhaps signaling that Sloan and Bentley never revealed their arrangement to Schuchmann. In addition, Bentley personally wrote FASB an apology letter after receiving a late notice, assuring FASB that all future payments would receive prompt attention.

The trail of the loan proceeds may similarly indicate an attempt to deceive Schuchmann. In order to disguise the true recipient of the funds, the loan proceeds were wired into Bentley's personal account, not Sloan's, and Bentley repaid the loan by writing checks from her personal account. Sloan designed this scheme and advised Bentley about all aspects of her loan application, including the appropriate terms for the promissory note. Because no testimony establishes that Sloan needed to consult Schuchmann for this information, Sloan and Bentley's "private" arrangement may not have included Schuchmann.

The second key witness, Don Faraone, who was at the time president of Americity, testified that Schuchmann told him that "we have to take care -- reimburse Sloan in the form of his consulting fees so that he can pay the loan that he has through Bentley." (R. 19, p. 145) Schuchmann spoke in the present tense about Sloan making payments on the loan. When cross-examined about the timing of the conversation, Faraone testified that it occurred either (1) when Sloan was moving into the Americity offices; or (2) when Sloan's consulting contract was being renegotiated. However, both of these events occurred in the summer of 1987, approximately nine

8

months after repayment of the Bentley loan. Thus, in July of 1987, there would have been no need to help Sloan repay his loan.

As a result of this inconsistency, the district court concluded that it was factually impossible for this conversation to have taken place. See United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991) ("[T]estimony generally should not be declared incredible as a matter of law unless it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature."). We do not find this testimony incredible as a matter of law, because Faraone may have simply confused the timing of the conversation or the verb tense Schuchmann used. However, even when construed in favor of the jury verdict, this evidence does not support the inference that Schuchmann "knew" at the time the loan was made that it was a nominee loan. Instead, this testimony only permits the inference that Schuchmann knew at some point after Bentley received her loan proceeds that she had given them to Sloan.

Although not as direct as Faraone's testimony, the government also relies on the testimony of defense expert Eric Stattin and bank examiner Ray Wiske to establish Schuchmann's guilt. We find the connections between the testimony of these two witnesses and Schuchmann's state of mind too attenuated to support his conviction. According to the government, Eric Stattin testified that, in preparing for the trial, he had been advised that Sloan told Schuchmann that he, Sloan, would see to it that FASB was repaid for Bentley's loan.

> Question: So were you advised by the defense that somebody told Mr. Schuchmann that there was a supporter out there of Laura Bentley who would see to it that her loan was paid back?
> Stattin: Yes, I believe I was told that.
> Question: Was that Mr. Sloan?
> Stattin: Yes.
> Question: Did Mr. Schuchmann ever say to you that he had talked with Laura Bentley's family?
> Stattin: I don't remember hearing that. (R.20, p. 110)

Even if Sloan told Schuchmann that he would support the loan, nothing in this dialogue indicates that Sloan revealed the nominee nature of the loan to Schuchmann. Indeed, a plausible interpretation of this testimony is that when questioned by Schuchmann about the Bentley loan, Sloan misled Schuchmann into believing that Bentley, the true borrower, would not be a credit risk. The nominee loan would not have been the first secret Sloan kept from Schuchmann. Bentley testified that she and Sloan had a practice of forging Schuchmann's signature without his knowledge and authorization.

Ray Wiske's testimony is also insufficient. Wiske, a federal bank examiner, testified that he reviewed FASB's books and discussed Bentley's loan with Schuchmann in March of 1986. Wiske criticized that loan, along with James Jarocki's, on the ground that the creditworthiness of the borrowers was not established by the loan documentation. In explaining his actions, Schuchmann told Wiske that "all these borrowers [Bentley, Jarocki, and the other four Americity investors] are well-known to him and he expects no problems with the loan payments. He said he had committed to make the loans at the approximate time he gained control of the association." (R. 14, p. 11) According to the government, this

10

statement refers to February of 1985 when Schuchmann gained control of FASB.  Although Schuchmann argues that this statement is plagued by ambiguous language and may refer to a later date, we view the statement in the light most favorable to the government.  The government argues that this statement was intended purposely to mislead Wiske, because Schuchmann had never "committed" to make the loan to Bentley in February of 1985.  Although the government may be really arguing that this statement proves Schuchmann had committed to make the loan to Sloan (instead of Bentley), such an inferential leap is simply too tenuous to support a finding of intent beyond a reasonable doubt.  Moreover, this statement is insufficient to establish that Schuchmann was intentionally misleading the bank examiner, since it is uncontested that he may have committed to most of the loans referred to at that time.

The government next highlights Schuchmann's active role in negotiating with other Americity investors to draw the inference that Schuchmann monitored Sloan's efforts to raise the necessary investment funds.  However, only five of the eighteen investors obtained loans through FASB; eight of the remaining thirteen investors funded their investments totally independent of Schuchmann and FASB; and four were members of the Schuchmann family.  The remaining investor, Sloan, purchased $645,000 of stock, using the $210,000 from the Bentley loan and $435,000 from non-FASB sources to fund his investment.  This pattern of investment does not give rise to the inference that Schuchmann participated in each investor's financing, and therefore, would

11

have necessarily known how Sloan raised the funds for his investment.

Schuchmann's prior business relationship with Sloan likewise does not aid the government in establishing that Schuchmann supervised Sloan's investment. While Schuchmann and Sloan may have had a close business relationship, the evidence demonstrates that Schuchmann did not participate in many of Sloan's business ventures. Moreover, in October 1985, Schuchmann had no reason to believe that Sloan was short of funds and needed to borrow $210,000. Even if Schuchmann knew Sloan needed money, the evidence shows that Schuchmann either could have personally lent Sloan the money or cured the prospective loan-to-one-borrower problem. Government witness James Neil testified that three weeks before the Bentley loan Schuchmann had personally lent him $200,000, even though Neil still had loan-to-one-borrower capacity. And Schuchmann was certainly not lacking in funds with access to more than $4.4 million in cash in October of 1985. Fred Miller, a government witness, testified that Schuchmann could have withdrawn $210,000 from his personal accounts at that time simply by writing a check. (R. 16, p. 36) A personal loan, however, would not have been Schuchmann's only legal option to help Sloan raise the necessary funds. Expert witness Rosemary Stewart, who in 1985 was the Director of Enforcement for the Federal Home Loan Bank Board, testified that in 1985 a savings and loan institution could easily cure a prospective loan-to-one-borrower problem by selling to another institution a participation in the borrower's existing

12

loans. (R. 20, p. 162)

Finally, the government emphasizes that Bentley's loan coincided with the five other loans made by Schuchmann's bank to the people who were investing in Americity. When examined closely, however, this coincidence does not prove that Schuchmann knew that the Bentley loan was intended for Sloan's investment. There are significant differences between the investors' loans and Bentley's loan. The loans to the five investors were all dated October 15, 1985, had identical interest rates, and ranged in amount from $40,000 to $90,000. By contrast, Bentley's loan was dated three days later (October 18, 1985), had a higher interest rate than the investors' loans, and totaled $210,000. (R.14, pp.10-11) We are persuaded that, even when viewed in tandem with the other evidence, this similarity in timing only permits a jury to "speculate" about the defendant's state of mind rather than infer knowledge beyond a reasonable doubt.

All of this evidence, taken together and viewed in the proper light, does not support the jury's guilty verdicts. The evidence provides equal circumstantial support to Schuchmann's innocence, leaving open the question whether Schuchmann was Sloan's co-conspirator or his victim. Thus, the government failed to prove the knowledge element of the crimes charged beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, the judgment of acquittal is AFFIRMED.

13