**OKLAHOMA BANKERS ASSOCIATION,**
Petitioner,

v.

**FEDERAL RESERVE BOARD,**
Respondent,

and

Citicorp, Intervenor.

No. 83–2591.

United States Court of Appeals,
Tenth Circuit.

July 9, 1985.

Laura Nan Pringle, Vice President and Gen. Counsel, Oklahoma Bankers Ass'n, Oklahoma City, Okl., for petitioner.

Richard K. Willard, Acting Asst. Atty. Gen., Civil Div., U.S. Dept. of Justice, Washington, D.C., Michael Bradfield, Gen. Counsel, Richard M. Ashton, Asst. Gen. Counsel, James E. Scott and James A. Michaels, Attys., Board of Governors of the Federal Reserve System, Washington, D.C., for respondent.

Arnold M. Lerman, Christopher R. Lipsett and Charles E. Davidow of Wilmer, Cutler & Pickering, Washington, D.C., for intervenor.

Before HOLLOWAY, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.

SETH, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

We review a Federal Reserve Board order approving the purchase of an inactive Oklahoma trust company charter by Citicorp. Citicorp is a bank holding company under section 2(a) of the Bank Holding Company Act. 12 U.S.C. §§ 1841–1850. Its principal place of business is New York. The Act restricts the kind of out-of-state subsidiaries a bank holding company may own. Citicorp proposes to operate subsidiary offices in Tulsa and Oklahoma City under the name Citicorp Savings and Trust Company (CSTC). CSTC plans to offer consumer and commercial lending. It also intends to issue thrift certificates and thrift passbook certificates. CSTC expressly stated in its application that it would not accept demand deposits or other transactional accounts.

The Oklahoma Bankers Association objected to the Board's approval of Citicorp's proposed acquisition. At the heart of the Association's objection is the assertion that CSTC is a "bank" for purposes of the Bank Holding Company Act. 12 U.S.C. § 1841(c). The Association maintains the thrift accounts offered by CSTC are "demand deposits" under the Act.

Citicorp first filed its application to purchase the Cherokee Title & Trust Company charter in March of 1983 with the Federal Reserve Bank of New York. It proposed to offer de novo services, both commercial lending and thrift deposits, through its subsidiary CSTC. Citicorp planned to operate CSTC from the offices of its existing consumer finance subsidiary, Citicorp Person to Person. The acquisition of the Oklahoma trust charter enables CSTC to offer industrial banking services. The list of industrial bank activities offered by CSTC included the:

"making or acquiring of loans and other extensions of credit, secured or unsecured, for consumer and other purposes; the sale of credit related life and accident and health insurance by licensed agents or brokers, as required; the issuing of thrift certificates and thrift passbook certificates; the sale of consumer oriented financial management courses...."

48 Fed.Reg. 14,756 (1983). The Board described thrift certificates in its brief as "fixed time certificates, redeemable only after a minimum maturity period," which seems to be the generally accepted definition.

The Bankers Association submitted comments on Citicorp's proposal to the Federal Reserve Bank of New York and requested a hearing. The Reserve Bank approved the Citicorp proposal and the Association

petitioned the Federal Reserve Board for review of the Reserve Bank's decision. The Board agreed to review the proposal and approved Citicorp's application to operate CSTC as a limited function institution engaged in industrial bank activities.

The Bank Holding Company Act prohibits the purchase of a bank located in any state other than the bank holding company's principal place of business. 12 U.S.C. § 1842(d). Section 2(c) of the Act defines a "bank" as an institution which makes commercial loans *and* accepts "deposits that the depositor has a legal right to withdraw on demand." 12 U.S.C. § 1841(c). Congress has narrowed the definition of a "bank" for purposes of federal regulation since the Act's creation. As this court stated in *Dimension Financial Corp. v. Board of Governors,* 744 F.2d 1402, 1407 (10th Cir.), *petition for cert. granted,* "[t]he Act itself with the clearly expressed definitions permitted the development of non-bank banks." We also noted in *Dimension* that in recent years unexpected numbers of institutions fell within the non-bank exception molded by Congress. The Federal Reserve Board decided that the limited functions of CSTC as proposed by Citicorp fell within the definition of a non-bank bank under the Act.

The Bankers Association attack on the Board's decision is directed to the characterization of the thrift deposit accounts to be offered by CSTC. The Association would define thrift certificate deposits as "demand deposits" under section 2(c). CSTC unquestionably meets the first criteria of the Act's "bank" test as it intends to make commercial loans. If thrift certificate deposits are "demand deposits" as the Association urges, then CSTC is a "bank" under the Act. The Association's second line of attack on the Board's order centers on the powers of a trust company under Oklahoma law. It argues that since trust companies chartered in Oklahoma are entitled to take demand deposits CSTC must be a "bank" under the Act.

Section 2(c) of the Act defines a demand deposit as one which "the depositor has a *legal right* to withdraw on demand." 12 U.S.C. § 1841(c) (emphasis added). The Federal Reserve Board found thrift certificates lacked the characteristics of a demand deposit as funds are not "payable on demand to third parties." Rather withdrawals from these thrift deposits are made by the equivalent of a direct presentment of a passbook by the depositor, and a thrift certificate is generally "redeemable only after a minimum maturity period." Thus the Board was satisfied that CSTC's thrift passbook certificates were "time deposits" rather than "transactional accounts."

In *First Bancorporation v. Board of Governors,* 728 F.2d 434 (10th Cir.), we held NOW accounts were not demand deposits. We focused our analysis on the depositor's "legal right" to withdraw on demand. *Id.* at 436. The only significant difference between the depositor's legal right to withdraw on demand examined in the *First Bancorporation* case and the depositors' rights examined here lies in the source of the restriction. Utah law specifically directed that industrial loan companies must reserve the right to demand notice from a depositor before withdrawal in *First Bancorporation.* Oklahoma law is silent on this matter. The banking statutes do not expressly regulate deposits taken by industrial banks. However Oklahoma does authorize the Banking Board to regulate CSTC and govern its examination. Okla. Stat.Ann. tit. 6, § 203.

Citicorp states that the thrift certificates deposits "will be governed by specific, legally enforceable, contractual agreements that make explicit CSTC's right to 14 or more days' notice of withdrawal." Thus in *First Bancorporation* the depositor had no legal right to withdraw on demand under state law while the Citicorp proposal denies a depositor this same right by private contractual arrangement. This difference, state regulation versus private contractual agreement, does not change the depositors' basic legal status. A private agreement between a financial institution and its depositor is enforceable under Okla-

homa law. A deposit "may be subject to any agreement which the depositor and the bank may make with respect to it." *Duncan v. Anderson,* 120 Okl. 194, 250 P. 1018, 1019. A depositor is denied a legal right to withdraw his deposit on demand in both cases.

■ The Association urges this court to look at actual banking practice when deciding whether an account is a "demand deposit." We rejected this argument in *First Bancorporation,* 728 F.2d at 436. We stated there, "[n]o room exists for an argument that a practice as to ... accounts should prevail rather than the statute." *Id.* at 437.

■ We uphold the Board's determination that the thrift certificates to be offered by CSTC are not demand deposits as defined by the Act.

The Association's claim is also based on Oklahoma banking laws which empower a trust company to "receive deposits of trust monies." Okla.Stat.Ann. tit. 6, § 1001(A)(1). The State Bank Commissioner has opined that "such trust deposits may be withdrawn on demand." The powers granted to trust companies by Oklahoma law are substantially similar to the powers granted banks. *Compare* Okla.Stat.Ann. tit. 6, § 402 *with* § 1001. (Section 402 grants both banks and trust companies the same general powers.) Thus the Bankers Association argues Citicorp's purchase of the Cherokee Title & Trust Company charter makes it possible for CSTC to offer the same or similar services as a bank chartered in Oklahoma.

■ The trust charter may grant CSTC the power to offer bank services but the Board's approval of Citicorp's application grants it no *right* to exercise this power. The Board order allows CSTC to operate as a limited purpose industrial bank. Congress authorized the Federal Reserve Board "to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of this chapter and *prevent evasions* thereof." 12 U.S.C. § 1844(b) (emphasis added).

Should a subsidiary classified as a non-bank under the Act alter its deposit-taking practices so as to violate the Act the Board may order that institution to cease and desist from such practices. 12 U.S.C. § 1818(b)(3). The Third Circuit upheld the Board's authority under these statutory provisions in *Wilshire Oil Co. v. Board of Governors,* 668 F.2d 732 (3d Cir.). We find the Board's ability to enforce the provisions of the Act assures compliance with any limitations on a non-bank's activities set out in its orders.

■ The Association's argument also fails to reflect the amendments to the Act and their significance. Originally the Act determined whether an institution was a "bank" by examining its charter. A 1966 amendment to the Act abandoned the charter test and narrowed the statutory definition of a bank. *See Dimension Financial Corp. v. Board of Governors,* 744 F.2d 1402, 1404 (10th Cir.). The Association asks this court to retreat to a position Congress intentionally abandoned. We no longer look to the possible powers an institution may exercise under a state charter but rather decide whether it meets both the deposit and commercial lending elements of the statutory test. *Id.* at 1404. An organization which has voluntarily limited its functions in order to conform to the Act's definition of a non-bank simply cannot use all the powers granted by a state charter.

The Association additionally objects to the Board's determination that the services to be offered by CSTC are "closely related" to banking and will benefit the public. *See* 12 U.S.C. § 1843(c)(8). The Act requires the Board to make these two separate determinations before it may approve a proposed interstate purchase of a non-bank by a holding company.

■ The Board must first determine if the institution's activities are "so closely related to banking ... as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8). A list of activities predetermined to be "closely related" to banking is codified at 12 C.F.R. § 225.4(a). Citicorp's proposed

services are within this list. *See* 12 C.F.R. § 225.4(a)(1)(2)(3) and (9). The Board's determination of what activities are "closely related" to banking is entitled to the "greatest deference." *Board of Governors v. Investment Company Institute*, 450 U.S. 46, 56, 101 S.Ct. 973, 981, 67 L.Ed.2d 36.

Federal law under the non-bank exception to the Act expressly envisions the operation of industrial banks in Oklahoma by out-of-state bank holding companies. The Senate Banking Committee chairman stated a 1966 amendment to section 2(c) of the Act "clearly exclude[d] industrial banks" from definition as a "bank." 112 Cong. Rec. 12386. Industrial banking activities are consonant with Oklahoma law.

The Board considered the activities proposed by Citicorp as those of an industrial bank. In the proper exercise of its authority it found these activities "closely related" to banking under the terms of the Act and applicable regulations.

The Board by statute is to decide whether CSTC's performance "can reasonably be expected to produce benefits to the public." 12 U.S.C. § 1843(c)(8). Congress instructed the Board to weigh public benefit factors such as "greater convenience, increased competition, or gains in efficiency" against "possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices." *Id.* The purpose of the public benefits determination is to avoid the dangers of monopoly:

"Because of the importance of the banking system to the national economy, adequate safeguards should be provided against undue concentration of control of banking activities. The dangers accompanying monopoly in this field are particularly undesirable in view of the significant part played by banking in our present national economy."

S.Rep. No. 1084, 91st Cong., 2d Sess. 24, U.S.Code Cong. & Admin.News pp. 5519, 5520.

The basic standard for review of Board decisions is set out by 12 U.S.C. § 1848: "The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." Determinations by the Board are entitled to great deference when made within the scope of its authority. *First Bancorporation v. Board of Governors*, 728 F.2d 434 (10th Cir.); *Western Bancshares, Inc. v. Board of Governors*, 480 F.2d 749 (10th Cir.). In *Dimension* we outlined the scope of the Board's authority under the Act:

"The authority of the Board under the Act is to be exercised in a restricted area. It does not have the broad scope to work in as do many other agencies. There is not present a 'public good' or 'public benefit' provision. Instead, the BHCA limits the subject matter of the Board's functions basically to anticompetitive considerations."

744 F.2d at 1408. The exercise of discretion required by 12 U.S.C. § 1843(c)(8) is to be directed primarily to anticompetitive considerations.

■ Citicorp is the second largest commercial banking organization in the United States. Citicorp's total consolidated assets are $130.2 billion. By comparison, the largest Oklahoma bank holding company possesses $3 billion in total consolidated assets. The Association asserts that Citicorp's size alone raises the spectre of monopoly power. A similar argument was rejected by the court in *Connecticut Bankers Association v. Board of Governors*, 627 F.2d 245 (D.C.Cir.). The court there stated that the relationship between aggregate size and undue concentration of resources creates:

"[a] problem, [which] if it exists at all, must be broadly addressed as a policy matter implicating the basic legislative and regulatory scheme now in effect. The Board did not err when it failed to hold an adjudicatory hearing, on a single Section 4(c)(8) application, in order to raise and resolve this broad, complex, and far-reaching concern."

*Connecticut Bankers*, 627 F.2d at 255. Had Congress intended aggregate size to be a factor in the public benefit determination it could have so declared. *See Western Bancshares, Inc. v. Board of Governors*, 480 F.2d 749 (10th Cir.).

■ The Association also seeks to refute the Board's finding that the "de novo nature of Citicorp's entry will provide an additional competitor and an additional source of consumer and commercial loans." It argues that Citicorp will merely continue the lending operation established in Oklahoma by Citicorp Person to Person. Congress determined de novo entry into a market was more likely procompetitive:

> "[W]here a bank holding company enters a new market *de novo*, or through acquisition of a small firm, as opposed to acquisition of a substantial competitor, its desire to succeed in its new endeavor is more likely to be competitive."

1970 U.S.Code Cong. & Ad.News 5568. The Board may properly consider the addition of new business services as a de novo entry into the market. *Alabama Association of Insurance Agents v. Board of Governors*, 533 F.2d 224, 249 (5th Cir.).

■ The Association also argues the Board erred by not granting it a full evidentiary hearing. A protestant has no automatic right to an evidentiary hearing. Section 4(c)(8) only requires notice and an "opportunity for hearing." 12 U.S.C. § 1843(c)(8). "This court has recognized that the Board in its discretion may allow oral argument or hold hearings for the purpose of taking evidence." *Bank of Boulder v. Board of Governors*, 535 F.2d 1221, 1225 (10th Cir.), citing *Bank of Commerce v. Board of Governors*, 513 F.2d 164 (10th Cir.). However the Board must provide an evidentiary hearing "[w]here a contest exists with respect to a material fact." *Connecticut Bankers Association v. Board of Governors*, 627 F.2d 245, 251 (D.C.Cir.). *See also Independent Bankers Association of Georgia v. Board of Governors*, 516 F.2d 1206 (D.C.Cir.); *American Bancorporation, Inc. v. Board of Governors*, 509 F.2d 29 (8th Cir.). The burden is on the protestant to specifically show that the record "fails to accurately portray its position" and disputed facts exist. *Bank of Boulder v. Board of Governors*, 535 F.2d 1221, 1225 (10th Cir.). This has not been done.

AFFIRMED.