Tom RAPP, Harry Rapp, Mark Rapp, Lori Rapp, Patricia Rapp, Mary Rapp, Michael Rapp, and Debra Wallace, Petitioners,

v.

UNITED STATES DEPARTMENT OF TREASURY, OFFICE OF THRIFT SUPERVISION, Respondent.

No. 93–9500.

United States Court of Appeals, Tenth Circuit.

April 14, 1995.

James R. Cage (Magdalena C. Bowen with him on the brief), Berryhill, Cage & North, P.C., Denver, CO, for petitioners.

Elizabeth R. Moore, Asst. Chief Counsel (Carolyn B. Lieberman, Acting Chief Counsel, and Thomas J. Segal, Deputy Chief Counsel with her on the brief), Office of Thrift Supervision, Washington, DC, for respondent.

Before SEYMOUR and TACHA, Circuit Judges, and VRATIL, District Judge.[*]

VRATIL, District Judge.

Petitioners Tom Rapp, Harry Rapp, Mark Rapp, Lori Rapp, Patricia Rapp, Mary Rapp, Michael Rapp, and Debra Rapp Wallace ("the Rapps") petition for review of an order of the Director of the Office of Thrift Supervision ("OTS") dated December 4, 1992. In that order, the Director found that the Rapps in concert had willfully acquired and/or retained control of a federally-insured thrift without filing prior notice, in violation of the Change in Bank Control Act of 1978 ("the Control Act"), 12 U.S.C. § 1817(j), and the Savings and Loan Holding Company Act ("the Holding Company Act"), 12 U.S.C. § 1467a. Pursuant to that finding, the Director assessed various civil money penalties, in the aggregate amount of $1,415,243, against the individual Rapps.

This Court has jurisdiction under 12 U.S.C. §§ 1467a(i)(2)(C), 1817(j)(16)(F), and 1818(h)(2). For reasons stated below, we affirm the Director's order.

## A. FACTUAL BACKGROUND

The Rapps are related family members. Tom and Harry are brothers. Harry is married to Patricia. Tom is married to Mary and they have four children: Mark, Lori, Michael, and Debra.

In 1984, Charles Bartlett recruited Tom to help organize First Northern Savings ("FNS"), a new local savings and loan association in Greeley, Colorado. Tom believed that he had a conflict of interest due to his involvement with a local bank, so he suggested that his daughter Lori participate. As a result, Lori became an organizer of FNS and served on its Board of Directors from its inception in 1984 until August 21, 1990. Although Tom was not formally an organizer of FNS, he was extremely active in marketing and selling FNS shares, and he vastly influenced the Rapp family's acquisition of FNS stock. In addition, Tom served as director of FNS from July 15, 1985, through October 31, 1989, holding positions as chairman of the board and vice president.

Between October, 1984, and July, 1985, the Rapps and two Rapp-owned partnerships, RAPCO and TRASCO,[1] collectively acquired at least 87,000 shares—43 percent—of outstanding FNS stock. The Rapps acquired the stock as a short-term investment, expecting to sell a control block at two to three times its book value within several years.

In late August or early September of 1985, Tom divined through a newspaper article that the Rapp family might need government approval to own 43 percent of FNS stock. As a result, he and FNS president Charles Bartlett solicited legal advice on behalf of FNS. By letter dated September 17, 1985, counsel advised that the Rapp stock ownership constituted a control violation and that one of two things must occur: either (1) the Rapps should give notice of their control ownership to the Federal Savings and Loan Insurance Corporation ("FSLIC") pursuant to 12 C.F.R. § 563.18–2 (1985),[2] or (2) as a

---

[*] The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

1. RAPCO is an investment partnership comprised of Tom's wife Mary and their children, Mark, Lori, Michael and Debra, petitioners herein. TRASCO is an investment partnership comprised of Harry's wife Patricia and their three sons. The sons are not parties to this action.

2. Apparently this advice was based on the premise that late notice is better than no notice at all. Section 563.18–2(c) requires 60 days *prior* written notice whenever any person or persons acting in concert will acquire direct or indirect power to direct the management or policies of an insured institution or to vote 25 percent or more of any class of voting securities of an insured institution. Within the 60–day review period,

group, the Rapps should immediately divest sufficient shares to bring their combined ownership to less than 25 percent of total outstanding shares. The Rapps elected not to file notice with FSLIC, but within one week they transferred 38,750 shares (approximately 45 percent of their holdings) to other individuals.

Specifically, on September 17, 1985, Harry and Patricia transferred 16,500 shares of FNS stock to Judy Nelson, who worked as a secretary at Harry's company. On September 18, 1985, Tom and Mary transferred 12,250 shares to Ivan Shupe, a long-time family friend. And on September 23, 1985, Mark transferred 10,000 shares to his business partner, Bruce Copp. The Director found that these stock transfers were sham transactions, structured to reserve the attributes of ownership and control to the Rapp family while formally registering the stock in the names of third parties.[3]

After the stock transfers, the Rapps continued to search for potential buyers for the stock which they had already—at least nominally—sold to Nelson, Shupe and Copp. Indeed, on March 17, 1986, Mark sold to Harold Winograd the stock which he had nominally transferred to Copp.[4]

On August 20, 1987, Nelson asked Harry to take the FNS shares out of her name and cancel and return the promissory note and agreement.[5] On September 9, 1987, Harry cancelled and returned the agreement and promissory note, but he did not transfer the stock out of Nelson's name. Shortly thereafter, Nelson informed FNS that she had assigned the stock back to Harry and Patricia and on October 30, 1987, FNS notified the Federal Home Loan Bank Board ("FHLBB") that the Rapp family might be in violation of the Control Act.[6]

On December 29, 1987, Harry transferred the "Nelson" shares to Harry Asmus, Tom's neighbor and long-time acquaintance, and Kathryn Landrum, Harry's sister-in-law. Through TRASCO, Harry's wife and sons provided full financing for the transactions and took back non-recourse demand notes secured by the stock. Asmus and Landrum endorsed the stock certificates and Harry retained possession of them. Asmus and Landrum paid no interest or principal on the notes. On December 9, 1988, Harry informed Landrum that he had overstated the financial condition of FNS and would discount her note to reflect year-end book value. Landrum replied that she had no alternative but to return the stock and that she expected Harry to cancel the note and waive interest to date. Harry subsequently sold the stock to an unrelated third party for half what Landrum had purportedly paid him.

After the Rapps learned of their control violation in September, 1985, and even after they had executed the nominal transfers to Nelson, Shupe and Copp, the Rapps acquired

---

FSLIC may disapprove the proposed acquisition. *See* 12 C.F.R. § 563.18–2(g).

3. Each transfer was structured as a "sale" in which the buyer executed a non-recourse, interest-bearing demand note for the full purchase price of the stock. The Rapps retained the stock certificates, endorsed in blank by the buyers, as security. The buyers executed hypothecation agreements which permitted the Rapps to pledge the stock as collateral. These transactions were free of risk to the buyers. The buyers were not responsible for interest or principal on the notes unless and until third parties purchased the stock. In that event, depending upon the resale price, Nelson, Shupe or Copp could pay off the notes and retain the profit, or default on the notes and walk away from the transaction with no personal liability whatsoever.

4. Copp played no role in this transaction. Mark informed Copp that he had a buyer and was

going to take the stock back. Mark (not Copp) received the sale proceeds, and the sale to Winograd was for $70,000 less than the purported sale to Copp some six months earlier.

5. Shortly after the transfer to Nelson, Harry and Patricia signed an agreement wherein they retained all right, title and interest in the stock purportedly sold to Nelson, including the right to dividends. In the agreement, Harry and Patricia also assumed liability for any capital gains tax resulting from Nelson's sale of the stock.

6. Shortly thereafter, on December 11, 1987, the State of Colorado sent Nelson a questionnaire concerning her ownership of FNS stock. *Harry* completed the questionnaire, stating that Nelson still owned 16,500 shares of FNS stock. At the administrative hearing Harry denied that he had completed the form but both the ALJ and the Director found otherwise and their findings are supported by substantial evidence.

additional shares of FNS stock. On April 11, 1986, Tom purchased 500 FNS shares. On the same date Tom's sister, Katherine Rapp Miller, purchased 1,000 shares. On December 31, 1987, Lori exercised stock warrants for an additional 2,500 shares.

Throughout the time that the Rapp family was in violation of the control statutes, Tom was actively involved in efforts to sell a control block of FNS stock at a premium price. He placed numerous advertisements in national publications, claiming that he and his family and friends owned over 50 percent of FNS stock and offering to coordinate a sale of that stock for a personal fee.

On January 10, 1990, the OTS issued Enforcement Review Committee Resolution No. ERC 90–7, along with a Notice of Assessment of a Civil Money Penalty ("Notice of Assessment"), charging that since July, 1985, the Rapps had continually owned and had the power to vote more than 25 percent of the outstanding voting stock of First Northern Savings, in willful violation of Section 1817(j)(16) of the Control Act. The notice assessed a $1,000,000 penalty against Tom Rapp, with an additional $10,000 penalty for each day the violation continued. The notice also assessed penalties of $50,000, plus $1,000 for every day of continuing violation, against each of the seven remaining petitioners.[7]

On February 2, 1990, the Rapps answered the Notice of Assessment and requested an administrative hearing. The Administrative Law Judge ("ALJ") recommended summary judgment against the Rapps on, *inter alia*, the Rapps' affirmative defenses of estoppel and breach of contract. The ALJ held an administrative hearing from November 13 through 14, 1990, and April 16 through 19, 1991. On August 22, 1991, the ALJ issued his recommended decision, finding that the Rapps had engaged in a pattern of misconduct in willful violation of the Control Act. He recommended civil penalties in the amount of $100,000 against Tom Rapp and $20,000 against each of the remaining Rapps.

Both the Rapps and the OTS filed exceptions to the ALJ's recommended decision.

On December 4, 1992, the OTS Director issued his *Decision and Order on Assessment of Civil Money Penalties ("Final Decision")*, which found that from June 26, 1985 through November 13, 1990, over consecutive time periods, the Rapps in concert had violated both the Holding Company Act and the Control Act. More specifically, the Director found that from June 26, 1985, through December 31, 1989, the Rapps had violated the Holding Company Act, while from January 1, 1990, through November 13, 1990, the Rapps had violated the Control Act. As a consequence of these findings, the Director imposed statutory penalties in the following amounts: $971,600 against Tom Rapp; $186,900 against Harry Rapp; $186,900 against Mark Rapp; $29,370 against Lori Rapp; $16,020 against Patricia Rapp; $13,585 against Mary Rapp; $5,434 against Michael Rapp; and $5,434 against Debra Rapp Wallace.

The Rapps challenge the penalties on three separate grounds. First, they argue that the Director erroneously rejected their affirmative defenses that the OTS had breached an agreement to settle the civil money penalties for $5,000 or, alternatively, that the OTS was estopped from asserting civil money penalties in excess of $5,000. Second, the Rapps assert that the record does not justify second-tier penalties against individual family members. Finally, the Rapps claim that the OTS violated their constitutional due process rights.

### B. STANDARD OF REVIEW

■ Judicial review of OTS action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Under the APA we must "hold unlawful and set aside agency [adjudicatory] action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (E) unsupported by substantial evidence...." 5

---

7. The Notice of Assessment also imposed penalties against Stan Rapp, a brother of Tom and Harry. The Director found that penalties were not warranted as to Stan, because of his minimal involvement in the scheme. The Rapps do not challenge this finding and Stan is not a party to this appeal.

U.S.C. § 706(2); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Section 706 sets forth separate and distinct standards and each requires us to engage in a "substantial inquiry." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823; *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Although an agency's decision is entitled to a presumption of regularity, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823.

■ Under the arbitrary and capricious standard, we ascertain whether the agency examined the relevant data and articulated a rational explanation for its decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). In reviewing the agency's explanation, we determine whether the agency considered the relevant factors and whether it made a clear error of judgment. *Id.* at 43, 103 S.Ct. at 2866–67. Normally, we set aside agency action as arbitrary and capricious if

> the agency has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* As the reviewing court, we may not compensate for such deficiencies by supplying a reasoned basis for the agency's action that the agency itself has not given. *Id.*

■ Evidence is substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Under the substantial evidence test, we consider conflicts in the record and

specifically define those facts which support the agency's decision. *See Olenhouse*, 42 F.3d at 1576. "This requires a plenary review of the record as it existed before the agency." *Id.* at 1575.

## C. DISCUSSION

### 1. Affirmative Defenses

As noted above, the Rapps requested an administrative hearing on certain "affirmative defenses" to the Notice of Assessment dated January 10, 1990. More specifically, the Rapps argued that the OTS had agreed to settle all claims upon payment of a $5,000 penalty or, in the alternative, that the OTS was estopped from collecting a penalty greater than $5,000. The ALJ found that the OTS was entitled to summary judgment on petitioners' defenses, which they characterized as breach of contract and estoppel defenses. The Director adopted the ALJ recommendation in this regard, and petitioners challenge that decision. Because of the summary nature of these rulings, we take as true for purposes of appeal all facts properly asserted by the Rapps. *See, e.g., Oberstar v. FDIC*, 987 F.2d 494, 498 (8th Cir.1993).

In January, 1989, FHLBB notified the Rapps of the alleged Control Act violation. At that time, FHLBB offered to settle the matter upon payment of a $10,000 civil penalty and entry of an agreed cease and desist order. More particularly, FHLBB proposed a cease and desist order which would have required the Rapps to transfer to an approved trust all stock exceeding 9.9 percent of outstanding FNS stock. FHLBB's proposed order would have required the Rapps to also obtain approval of a rebuttal of control submission under Section 574.4(e)(1) of the Control Act Regulations, or allow the trustee to sell the stock exceeding 9.9 percent, with any profits being paid to FSLIC.

On May 1, 1989, the Rapps rejected FHLBB's offer and proposed to settle the civil penalties for $1,000. FHLBB rejected that proposal and proposed a $7,500 penalty. By letter dated May 24, 1989, the Rapps again rejected FHLBB's offer and proposed a $5,000 settlement. FHLBB eventually agreed to the Rapp's $5,000 penalty offer and

by letter dated June 22, 1989, sent them a proposed desist order which incorporated stipulations identical to those proposed in January, 1989.

The Rapps refused to accept the proposed stipulations and order. For the first time, they objected to a requirement that FSLIC receive the profit resulting from any sale of their stock. The parties thereafter continued to negotiate this point, focusing on the definition of "profit." Finally, however, by letter dated October 30, 1989, the OTS (which had then succeeded FHLBB under FIRREA) informed the Rapps that it saw no basis for further negotiations.[8]

On November 21, 1989, the Rapps wrote to the OTS, expressing an interest in continued negotiations. The OTS rebuffed this overture by letter dated November 28, 1989, noting that the Rapps had rejected all prior proposals and stating that the OTS did not intend to make a further proposal.

On December 18, 1989, the Rapps informed the OTS that its definition of profit was agreeable. They also expressed a belief that all issues were resolved and offered to sign and return corrected documents. The OTS did not respond to this proposal. Instead, on January 10, 1990, it issued the Notice of Assessment of penalties against Tom Rapp in the amount of $1,000,000 plus $10,000 for each day of continuing violation, and against the remaining petitioners in the amount of $50,000 plus $1,000 for each day of continuing violation. The Rapps contend that this penalty constituted a breach of the parties' agreement to settle the civil money penalty for $5,000. In the alternative, petitioners contend that the OTS is estopped from assessing a penalty in excess of $5,000.

### a. *Breach of Contract*

■ The Director found that no contract existed between the parties. Specifically, he noted that the amount of penalty was only one of many issues in a multi-faceted negotiation which continued long after the parties agreed to a $5,000 penalty. This finding is well-supported by the record and is not arbitrary, capricious, or an abuse of discretion. Although the parties agreed to the amount of penalty, the record clearly establishes that they failed to agree on other terms material to the settlement. *See Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1493 (D.C.Cir.1984) (absence of agreement on material term prevents formation of contract); *Mid–Continent Petroleum Corp. v. Russell,* 173 F.2d 620, 622 (10th Cir.1949) (no contract created where material terms and conditions of agreement are unsettled). No contract resulted from the Rapps' last-ditch and arguably disingenuous "acceptance" of a proposal which they had long since rejected. Under any reasonable view of the record, the OTS offer expired long before the Rapps attempted to accept it. Petitioners' breach of contract claim therefore fails as a matter of law, and the Director did not err in so holding.

### b. *Estoppel*

■ Alternatively, the Rapps assert that the OTS is estopped from imposing a civil penalty exceeding $5,000. Specifically, the Rapps claim that the Director misapplied the law by requiring them to show affirmative misconduct by the government as a condition of estoppel.

This Circuit has found that in order to prevail on a claim of governmental estoppel, the party seeking relief must show affirmative misconduct by the government. *See Board of County Comm'rs of County of Adams v. Isaac,* 18 F.3d 1492, 1499 (10th Cir.1994). The Director rejected the Rapps' allegation that the OTS had engaged in affirmative misconduct by enlarging the amount of penalties assessed against them. *See Final Decision,* p. 30–31 n. 34. In this regard, the Director did not err. "Affirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact." *Isaac,* 18 F.3d at 1499. The Rapps make no allegation that FHLBB or the OTS affirmatively misrepresented or concealed a

---

**8.** In August, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which abolished FHLBB and vested regulatory authority over federally-insured thrifts in the newly created Office of Thrift Supervision ("OTS"). *See* 12 U.S.C. § 1461, *et seq.*

material fact. Thus the Director's conclusion is well-supported in fact and in law.[9]

## 2. Penalty Assessment

The Rapps challenge the Director's assessment of second-tier penalties—as opposed to lesser, first-tier penalties—under the Control Act. The Control Act imposes second-tier penalties in the maximum amount of $25,000 per day for any violation which

 (I) is part of a pattern of misconduct;

 (II) causes or is likely to cause more than a minimal loss to such institution; or

 (III) results in pecuniary gain or other benefit to such person.

12 U.S.C. § 1817(j)(16)(B)(ii). A Control Act violation under Section 1817(j) which does not meet these criteria qualifies for first-tier penalties in the maximum amount of $5,000 per day. 12 U.S.C. § 1817(j)(16)(A).

The Director held that second-tier penalties were appropriate because the individual petitioners had engaged in a "pattern of misconduct" and had received "other benefit" under Sections 1817(j)(16)(B)(ii)(I) and (III), respectively. Petitioners argue that the Director's statutory interpretation is unreasonable and that his factual findings are arbitrary, capricious and unsupported by the evidence.[10]

### a. *Sham Transactions*

■ In finding a "pattern of misconduct," the Director concluded that the stock trans-

fers to Nelson, Shupe and Copp were sham transactions. Petitioners challenge this conclusion, arguing that it is unsupported by the record. We disagree. On this record, the Director could easily find that the stock transfers to Nelson, Shupe and Copp were transfers in name only, designed to conceal the Rapps' control violation and buy time for them to find *bona fide* purchasers who would buy the stock at a premium price.

The Rapps assert that the transactions were legitimate because Nelson, Shupe and Copp received genuine investment opportunities, in that they could pay off the notes and retain any profit. The record reflects that Nelson, Shupe and Copp had no intent of paying off the notes, however, and that they acquired their stock at prices which substantially exceeded the "going prices" of FNS shares. The likelihood that they would ever realize any profit was apparently slim or none. On this record, we readily affirm the Director's conclusion that the stock transfers were sham transactions.

### b. *Pattern of Misconduct*

The Rapps challenge the Director's further finding that the control violations by individual Rapps were part of a "pattern of misconduct" under Section 1817(j)(16)(B)(ii)(I). Specifically, petitioners assert that a "pattern of misconduct" under subsection (I) requires two or more Control Act violations and that misconduct surrounding a single violation cannot give rise to a "pattern of misconduct"

---

**9.** The Rapps also argue that at the administrative hearing, the ALJ improperly excluded evidence relating to the petitioners' breach of contract and estoppel claims, in violation of their due process rights and 5 U.S.C. § 556(c) and (d). By the time of the administrative hearing, however, the ALJ had properly eliminated the estoppel and breach of contract claims through summary judgment. Evidence concerning those claims was not relevant to the issues presented at the hearing, and the Rapps were not entitled to an evidentiary hearing on those matters. *See, e.g., Puerto Rico Aqueduct and Sewer Auth. v. U.S. EPA*, 35 F.3d 600, 606 (1st Cir.1994) (due process does not require agency to convene evidentiary hearing when no genuine issue of material fact exists), *cert. denied,* — U.S. —, 115 S.Ct. 1096, 130 L.Ed.2d 1065 (1995); *Oklahoma Bankers Ass'n v. Federal Reserve Board*, 766 F.2d 1446, 1452 (10th Cir.1985) (agency must provide evidentiary hearing where dispute of material fact

exists). *See also* 12 C.F.R. § 509.26 (1990). Petitioners' due process argument is therefore without merit.

**10.** Petitioners also complain that the Director's decision *implies* that the Rapps knew of their control violation in 1984 and that the violation continued through the date of the Director's final decision. These arguments are immaterial to the outcome of this appeal. The Director imposed penalties only from September 17, 1985, through November 12, 1990, the day before the administrative hearing began. He imposed no penalties for any violation before September, 1985, or after the date of the administrative hearing. The Rapps were not prejudiced by any "implication" that they violated control regulations during other time periods. *See* 5 U.S.C. § 706 (on judicial review of administrative action "due account shall be taken of the rule of prejudicial error").

under the statute.[11] The Rapps also com-plain that factually, the record does not sup-port a finding that each individual engaged in a "pattern of misconduct."

The Control Act does not define a "pattern of misconduct" and the legislative history is seemingly silent on this point. Congress has not specifically addressed the issue and in fact has entrusted the OTS with responsibili-ty for administering the statute. We there-fore give considerable deference to the Di-rector's interpretation and limit our review to a determination whether his construction of the statute is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984); *Home Mortg. Bank v. Ryan*, 986 F.2d 372, 376 (10th Cir.1993).

 Under the statute, any person who commits a control violation, "which violation ... is part of a pattern of misconduct," is liable for second-tier penalties. 12 U.S.C. § 1817(j)(16)(B)(ii)(I). The statutory lan-guage does not limit second-tier penalties to patterns of Control Act violations, nor does it stipulate that in order to incur liability for second-tier penalties each member of an of-fending control group must independently demonstrate a separate "pattern of miscon-duct." The plain language of the statute authorizes second-tier penalties if the control violation is part of a pattern of misconduct. In our view, the Director acted reasonably in so construing it.

In this case, citing the Rapps' repeated efforts to conceal their control violations and their continuing refusal to comply with con-trol regulations, the Director found a "pat-tern of misconduct" which authorized imposi-tion of second-tier penalties. In support of his conclusion, the Director cited the Rapps' ongoing acquisition of FNS stock, the sham stock transfers, Tom's misrepresentations to state regulators and FNS directors concern-

ing the propriety of the sham transactions, Harry's attempt to mislead state investiga-tors with respect to Nelson's stock owner-ship, and subsequent stock purchases by Tom and Lori after they had clearly learned of the control violation. *See Final Decision*, p. 26–27.

These findings were supported by substan-tial evidence, and the Director did not exceed his authority in finding that each petitioner's violation was part of a "pattern of miscon-duct" under Section 1817(j)(16)(B)(ii)(I).

### c. Other Benefit

 In part, the Director based the impo-sition of second-tier penalties on his finding that although petitioners had not received pecuniary profit from their control violation, they had received "other benefit" under Sec-tion 1817(j)(16)(B)(ii)(III). The Rapps con-tend that the Director erred in concluding that their control of FNS, without more, constituted "other benefit."

As a preliminary matter, contrary to peti-tioners' argument, the Director did not find that control ownership alone constituted "other benefit" sufficient to justify imposition of second-tier penalties in this case. The Director did state that petitioners' control was a benefit, but he found that the benefit was more than *de minimis*. Indeed, the Director outlined various benefits which the Rapps had secured as a result of their con-trol violation: they demanded and received seats on the FNS board of directors, with Tom serving as of chairman of the board, and through Tom, the Rapps advertised the insti-tution for sale, demanding a premium price for the family's control block of stock and negotiating a personal fee to bring the trans-action to completion.[12] *See Final Decision*, p. 28.

More importantly, on this record, the Di-rector's conclusion that petitioners benefitted

---

**11.** The Rapps further argue that because a "pat-tern of misconduct" cannot arise from a single control violation, first-time Control Act offenders (such as themselves) are immune from second-tier penalties under Section 1817(j)(16)(B)(ii)(I). The statutory language does not command this result, however, and the Director did not abuse his discretion in rejecting it.

**12.** That the Rapps considered their control a "benefit" is demonstrated by their refusal to re-linquish it—even when confronted with knowl-edge that it was illegal.

from their control violation is not arbitrary, capricious, or unsupported by the record.[13] *See Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. at 2866–67.

### d. *Mitigating Factors*

The Rapps complain that the Director failed to properly consider mitigating factors, especially the fact that FNS did not suffer financial loss as a result of the Rapps' misconduct. In determining the penalty to be assessed against each individual Rapp, however, the Director reduced the tentative penalty by 80 percent because petitioners' conduct did not cause a loss or risk of loss to FNS, and because the Rapps had no prior control violations. On this record, we find that the Director sufficiently considered mitigating factors and did not abuse his discretion in imposing the penalties. *See, e.g., Morgan v. Secretary of Hous. and Urban Dev.*, 985 F.2d 1451, 1458 (10th Cir.1993) (we will not disturb amount of penalty imposed unless it is abuse of discretion or otherwise arbitrary or capricious).

### 3. Due Process

■ Finally, the Rapps claim that the Director violated their statutory and constitutional due process rights in two respects.[14] First, they assert that the Director changed theories midstream by imposing penalties against them under the Holding Company Act, when the Notice of Assessment and ALJ had imposed penalties under the Control Act. Second, they contend that by announcing a new matrix methodology for assessing civil money penalties, the Director wrongfully performed an act of broad policy-making in a single adjudicatory proceeding. To remedy these purported violations, the Rapps ask not that the matter be remanded for statutorily and constitutionally sufficient procedures, but that petitioners be entirely relieved from any penalties for proven violations.

### a. *Notice of Statutory Basis for Penalties*

The Notice of Assessment and the ALJ levied civil money penalties under *the Control Act*, but the Director found that petitioners had violated *the Holding Company Act* from June 26, 1985, to December 31, 1989, because they had acted in concert with the RAPCO and TRASCO partnerships during that period.[15] The Rapps do not claim that the Holding Company Act is inapplicable, and we assume for purposes of this appeal that it does apply. Likewise, the Rapps do not claim that the Holding Company Act and the Control Act are substantively different in any respect relevant to this case. Rather, they argue that in "suddenly switching statutes," the Director violated petitioners' statutory and constitutional right to notice of the legal claims asserted against them.

Section 554 of the APA requires procedural fairness in the administrative process. *See* 5 U.S.C. § 554(b)(3) ("Persons entitled to notice of an agency hearing shall be timely informed of ... (3) the matters of fact and law asserted."); *Department of Educ. of*

---

13. Because the Director specifically found that the Rapps derived non-pecuniary benefit from their control violation, we do not address petitioners' argument that control in itself is not a benefit under 12 U.S.C. § 1817(j)(16)(B)(ii)(III). *But cf. Oberstar v. FDIC*, 987 F.2d 494, 502 (8th Cir.1993) (obtaining effective control of financial institution is no doubt "other benefit" under § 1818(e)(1)(B)(iii)).

14. We reject without further discussion the Rapps' contention that the OTS penalized them for pursuing administrative remedies by imposing daily penalties for the period after the Notice of Assessment, before the administrative hearing. Based on the Director's finding that the Rapps continued to violate control regulations during this time, it was not improper to assess daily penalties against them. *See, e.g., Abercrombie v. OCC*, 833 F.2d 672, 676–77 (7th Cir.1987) ("As a

practical matter, [persons] who know they are liable for a specified amount for each day a violation continues would be likely to cure the violation in a short order.").

15. The Director opined that control violations which involved joint participation by individuals and partnerships fell under both the Holding Company Act and the Control Act, but that the Control Act did not apply to transactions which were subject to the Holding Company Act. *See* 12 U.S.C. § 1817(j)(17)(C). He held that for the period when the Rapps acted jointly with RAPCO and TRASCO, they had violated the Holding Company Act and therefore not the Control Act. The partnerships had relinquished their stock ownership by December 31, 1989, so the Director applied the Control Act for the latter period.

*State of Cal. v. Bennett,* 864 F.2d 655, 659 (9th Cir.1988). Notice is sufficient as long as the party to an administrative proceeding is reasonably apprised of the issues in controversy and is not misled. *State of Wyo. v. Alexander,* 971 F.2d 531, 542 (10th Cir.1992); *Savina Home Indus., Inc. v. Secretary of Labor,* 594 F.2d 1358, 1365 (10th Cir.1979). In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice. *See Savina,* 594 F.2d at 1365 (no due process violation where no prejudice alleged); *Brock v. Dow Chemical U.S.A.,* 801 F.2d 926, 930–31 (7th Cir.1986).

Petitioners claim they sustained prejudice because they would not have entered into stipulations regarding RAPCO and TRASCO if they had known that the Holding Company Act was at issue. Petitioners do not specify what stipulations were prejudicial, however, or why notice of the Holding Company Act ramifications was material to their strategy. RAPCO and TRASCO were major players in the Control Act violations and petitioners seemingly agree that if the Holding Company Act did not apply by virtue of 12 U.S.C. § 1817(j)(17)(C), their identical conduct in concert with RAPCO and TRASCO would have violated the Control Act.[16] *See Final Decision,* p. 17–18 n. 21. We therefore comprehend no material prejudice with respect to petitioners' strategy concerning the stipulations.

The Rapps complain that prior to FIRREA the Holding Company Act differed substantially from the Control Act,[17] in that the Control Act prohibited only willful violations and provided *de novo* review by a district court, while the Holding Company Act at that time did not. Contrary to petitioners' assertion, however, both statutes required proof that a violation was willful. *Compare* 12 U.S.C. § 1730a(j) (1988) *with* 12 U.S.C. § 1817(j) (1988). It is true that prior to FIRREA, the Control Act provided *de novo* trial in district court for any action to collect a penalty,[18] while the Holding Company Act did not.

Significantly, petitioners do not contend that the disparity in post-assessment collection procedures colored their participation in the administrative hearing or affected in any material way their due process rights at that hearing. Petitioners merely assert that the appellate procedures differed and that, *a fortiori,* the notice was insufficient and the resulting penalties are unenforceable because petitioners received insufficient opportunity to challenge the imposition of Holding Act penalties in an administrative hearing. The Rapps do not disclose how they would have challenged such penalties, or in what way lack of notice has prejudiced them. Indeed, even in this appeal, petitioners do not challenge the imposition of Holding Act penalties or contend that the Holding Act is inapplicable to their conduct. In short, the Rapps have identified no issue which they would have presented differently had the Notice of Assessment stated that penalties would be assessed under both the Control Act and the Holding Company Act. On this record, petitioners have failed to allege material prejudice based on insufficiency of notice, and thus we find no violation of petitioners' due process rights. *See Savina,* 594 F.2d at 1365.

**16.** The Director found that the Notice of Assessment provided adequate notice to the Rapps because the Control Act and the Holding Act prohibit the same activity, apply substantially identical legal standards, and permit the same maximum penalties on the facts of this case. *Final Decision,* p. 17 n. 21. We agree. The two statutes prohibit identical activity (owning or controlling in excess of 25 percent of voting stock) by different entities, and the same regulations have applied to both statutes since 1985. *See* 12 C.F.R. § 574 *et seq.*

**17.** The Director imposed Holding Company Act penalties during both pre-FIRREA and post-FIRREA periods. Thus, petitioners' argument with regard to substantive differences between the pre-FIRREA statutes applies only to a portion of the Holding Company Act penalties assessed against them.

**18.** Prior to FIRREA, the Control Act provided that in any action by the agency to collect a penalty, "the person against whom the penalty has been assessed shall have a right to a trial de novo." 12 U.S.C. § 1817(j)(16). In *Miller v. FDIC,* 906 F.2d 972, 976 (4th Cir.1990), the Fourth Circuit concluded that this section guaranteed a *de novo* review as to all aspects of a penalty assessment, including liability and amount.

### b. *Penalty Matrix*

▮▮▮▮▮ , In 1980, the Federal Financial Institutions Examination Council ("FFIEC") issued a list of thirteen factors designed to assist federal bank and thrift regulatory agencies in deciding whether to impose civil money penalties and, if so, in what amounts. *See Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies*, 45 Fed.Reg. 59,423 (1980). In 1990, the OTS published a policy statement which, for internal use in assessing civil money penalties, contained a matrix incorporating the thirteen factors. *See* OTS Regulatory Bulletin 18–3 (1990). The matrix assigned to each factor a mathematical value which reflected its weight relative to the other factors. The OTS assigned each factor an additional value, reflecting (on a scale of 1 to 6) the degree to which that factor applied in the facts of the particular case. Through mathematical calculations prescribed in the regulatory bulletin, the OTS then arrived at a single number which when applied to the matrix, suggested a range of appropriate penalties.

In the Rapps' case, the Director found that the matrix was inadequate because it did not appropriately account for the three-tiered penalty structure imposed by FIRREA and sometimes resulted in "inconsistent and arbitrary" penalty assessments. *See Final Decision*, p. 37–38. As a result, the Director employed a different approach in weighing and evaluating the thirteen factors.[19] Specifically, using FIRREA's three-tier penalty structure as a starting point, the Director proposed an initial penalty amount for each petitioner. The Director increased or decreased that amount by various percentages, based on weights that he assigned to aggravating or mitigating factors corresponding with the thirteen matrix factors.[20] *See Final Decision*, p. 38–49. The Director detailed his decisional process at great length so as to provide "additional guidance on the assessment of civil money penalties in other matters." *Final Decision*, p. 19.

Petitioners do not claim that the Director's chosen method ·of assessing penalties was itself improper. Nor do they challenge the manner in which the Director applied that method to the facts of this case. Petitioners' sole argument is that while the Director applied the previously published matrix factors, he did not follow the matrix methodology and· the substituted methodology resulted in higher penalties against them. The Rapps contend that use of the substituted methodology was unlawful, in that it constituted broad policy-making and application in a single adjudicatory proceeding.[21]

Administrative agencies are not precluded from announcing new principles in an adjudicative proceeding, however, and the choice between rule-making and adjudication lies in the first instance within the agency's discretion. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947) (agency must retain power to deal with problems on case-by-case basis if administrative process to remain effective); *First Bancorporation v. Board of Governors of Fed. Reserve Sys.*, 728 F.2d 434, 437 (10th Cir.1984). Here, the Director chose to follow the methodology which was necessary, in his view, to appropriately account for the three-tier penalty structure in FIRREA.[22] This

---

**19.** Actually, the *Final Decision* factors do not perfectly correspond to those listed in the matrix. They are substantially similar, however, both in terms of the factors identified and the relative weights assigned to them.

**20.** The thirteen decisional factors were as follows: (1) willfulness; (2) frequency or recurrence; (3) continuation of violation; (4) failure to cooperate; (5) concealment; (6) harm to the institution or public confidence; (7) gain or benefit; (8) restitution; (9) prior violations; (10) previous criticism; (11) compliance program; (12) unsafe or unsound practices, or breaches of

fiduciary duty; (13) previous measures. *See Final Decision*, p. 44–49.

**21.** Petitioners couch their argument in due process terms, but they do not assert that notice of . . the new methodology would have affected their conduct in any way. Instead, the Rapps assert that the mere act of announcing a broad policy in an adjudicative setting is impermissible and, therefore, the penalties must be vacated.

**22.** Although the matrix was published in 1990, after FIRREA had been enacted, the OTS had been working on the matrix prior to the enactment and the Director expressed concern that

action did not amount to an abuse of discretion.

The Director had a duty to assess penalties appropriately under the applicable statutes, "regardless of whether those standards previously had been spelled out in a general rule or regulation." *Chenery,* 332 U.S. at 201, 67 S.Ct. at 1580. To rigidly say that the Director could not alter or amend the previously articulated matrix methodology would unreasonably restrict his ability to deal with the specialized problem of penalty assessment, especially where—as the OTS admitted in this case—the agency had little experience under FIRREA. *See id.* at 202–03, 67 S.Ct. at 1580–81.

By its terms, the OTS matrix methodology was an announcement of policy which the OTS hoped to implement in future adjudications. *See Phillips Petroleum Co. v. Johnson,* 22 F.3d 616, 620, *modified on other grounds,* 1994 WL 484506 (5th Cir.1994); *Pacific Gas & Elec. Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir.1974). In publishing the matrix methodology, the OTS stated that it was adopting the matrix because of new FIRREA changes and the agency's "relative inexperience" in the area. The OTS noted that it intended to revise the matrix as the agency gained experience in assessing penalties, and cautioned that the matrix "should be regarded as a living and evolving document." The OTS further stated that the matrix was "not a substitution for sound supervisory judgment," but was merely a "tool" in making penalty assessments.

The record establishes that the OTS never intended to bind itself to the matrix, and that petitioners had no reasonable or legally protected expectation that the OTS would apply matrix methodology in their case. Indeed, petitioners claim no detrimental reliance and demonstrate no prejudice, aside from speculation that a lower penalty might have resulted under the original scheme.

"[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence." *Butz v. Glover Livestock Commission,* 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power & Light Co. v. SEC,* 329 U.S. 90, 112, 67 S.Ct. 133, 145–46, 91 L.Ed. 103 (1946) (quotation omitted)). Thus, we will not disturb the amount of penalty imposed by the Director unless it is an abuse of discretion or otherwise arbitrary or capricious. *See Morgan,* 985 F.2d at 1458. While it is true that in some instances an agency's reliance on adjudication may amount to an abuse of discretion, *see First Bancorporation,* 728 F.2d at 437, that is not the situation here. This is not a case in which the OTS sought to impose a new liability for past actions which were taken in good-faith reliance on OTS pronouncements and thus, on this record, the Director's action was not an abuse of discretion. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974).

## D. CONCLUSION

For the foregoing reasons, we AFFIRM the Director's order.

---

the matrix did not account for FIRREA's three-tier penalty hierarchy. Specifically, he found that under the matrix, "the sum of factors for a first-tier violation could indicate a penalty in excess of the statutory maximum; the sums for second-tier and third-tier violations could indicate penalties well below what Congress contemplated...." *Final Decision,* p. 37–38.